# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Body Contour Ventures, LLC, | Case No. 19-42510-pjs |
| Debtor. | Hon. Phillip J. Shefferly |

## EMERGENCY MOTION FOR INTERIM AND FINAL ORDERS AUTHORIZING DEBTORS TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED, SUPERPRIORITY BASIS AND SCHEDULING A FINAL HEARING

The debtors and debtors-in-possession identified below (collectively,

"Debtors"),[1] need the financing requested in this Motion to stave off an

---

[1] This Motion is being filed on behalf of Debtors Body Contour Ventures, LLC, Case No. 19-42510, BCA Acquisitions, LLC, Case No. 19-42511, American Aesthetic Equipment, LLC, Case No. 19-42512, Knoxville Laser Spa LLC, Case No. 19-42513, LRX Alexandria, LLC, Case No. 19-42514, LRX Birmingham, LLC, Case No. 19-42515, LRX Charlotte, LLC, Case No. 19-42516, LRX Chicago, LLC, Case No. 19-42517, LRX Colorado Springs, LLC, Case No. 19-42518, LRX Dearborn, LLC, Case No. 19-42519, LRX East Lansing, LLC, Case No. 19-42520, LRX Grand Blanc, LLC, Case No. 19-30413, LRX Hoffman Estates, LLC, Case No. 19-42521, LRX Las Vegas Summerlin, LLC, Case No. 19-42522, LRX Mesa, LLC, Case No. 19-42523, LRX Naperville, LLC, Case No. 19-42524, LRX Novi, LLC, Case No. 19-42525, LRX Orland Park, LLC, Case No. 19-42526, LRX Plymouth-Canton, LLC, Case No. 19-42527, LRX Stone Oak, LLC, Case No. 19-42528, LRX Towson, LLC, Case No. 19-42530, LRX Troy, LLC, Case No. 19-42531, Premier Laser Spa of Greenville LLC, Case No. 19-42532, Premier Laser Spa of Indianapolis LLC, Case No. 19-42533, Premier Laser Spa of Louisville LLC, Case No. 19-42534, Premier Laser Spa of Pittsburgh LLC, Case No. 19-42535, Premier Laser Spa of St. Louis LLC, Case No. 19-42536, and Premier Laser Spa of Virginia LLC, Case No. 19-42537.

imminent liquidation and the loss of jobs around the country. The proposed

lender is the only potential source of financing Debtors have located after

an extensive search and several false starts. The proposed lender is not

an entrenched bank seeking to shore up its position or even a financing

institution. It is a limited liability company, some of whose members are

minority equity investors in some of the Debtors who have banded together

in an attempt to save these companies when no one else would. The

financing is expected to provide the Debtors a bridge to a sale to the DIP

Lender or a third party that submits the highest and best bid. Simply put,

without immediate approval of this financing, Debtors are done.

Debtors move, therefore, under 11 U.S.C. §§ 105, 362, 363, and

364, Fed. R. Bankr. P. 2002, 4001, and 9014, and E.D. Mich. LBR 4001-2,

4001-3, and 9013, for the entry of an order, in the form attached as <u>Exhibit</u>

<u>1</u> ("<u>Interim Order</u>"),[2] authorizing Debtors to, among other things, obtain

senior secured, superpriority financing from RVB Investment Group, LLC

("<u>DIP Lender</u>") on an interim and final basis, all as described in the term

---

[2] All capitalized terms used but not defined in this Motion have the meanings
given to them in the Interim Order. Debtors are also seeking entry of the
Interim Order as a final order, after a final hearing upon further notice and an
opportunity to be heard can be held, pursuant to Bankruptcy Rule
4001(c)(1)(C)(2). The final order is referred to as the "<u>Final Order</u>" and,
together with the Interim Order, the "<u>DIP Orders</u>."

sheet attached as Exhibit 2 ("Term Sheet") and in the proposed Interim Order.

In support of this Motion, (a) Debtors incorporate (i) the *Declaration of Richard C. Morgan in Support of Chapter 11 Filings* ("Morgan Declaration"), which is being filed simultaneously with the filing of this Motion; and (ii) the *Declaration of Carl J. Sekely in Support of Debtor-in-Possession Financing* ("Sekely Declaration") attached as Exhibit 3 to this Motion; and (b) Debtors respectfully state:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      This is a core proceeding under 28 U.S.C. § 157(b).

3.      Venue is proper in this district under 28 U.S.C. §§ 1408 and 1409.

4.      A motion for joint administration of Debtors' Chapter 11 cases for procedural purposes only is being filed contemporaneously with this Motion.  To the extent this Motion is granted, Debtors request that any order be applicable to all of Debtors' cases.

## BACKGROUND

5.      Debtors each commenced a voluntary case under Chapter 11

of Title 11 of the United States Code ("<u>Bankruptcy Code</u>") on February 22, 2019 ("<u>Petition Date</u>").

6.      Debtors are continuing in possession of their property and are operating and managing their businesses as debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108.

7.      No trustee, examiner, or official committee of unsecured creditors has been appointed in these Chapter 11 cases.

8.      The principal legal bases for the relief requested in this Motion are §§ 105, 362, 363, and 364 of the Bankruptcy Code, Rules 2002, 4001, and 9014 of the Federal Rules of Bankruptcy Procedure, E.D. Mich. LBR 4001-2 and 9014, and applicable case law.

## <u>FACTUAL BACKGROUND</u>

6.      Detailed facts about Debtors and the reasons for the commencement of their Chapter 11 cases are set forth in the Morgan Declaration.

### A.      Description of Businesses

7.      Debtors' stores provide non-surgical cosmetic procedures such as body contouring, skin tightening, and laser hair removal.

8.      Debtors provide their services through 25 stores across the nation.  Debtor Body Contour Ventures, LLC ("<u>BCV</u>") holds an interest in 18

of the stores, while Debtor BCA Acquisitions, LLC holds an interest in seven of the stores.

9.     Various third-party investors hold interests in some or all of the stores.  An overview of store ownership is detailed in the list of equity security holders filed with each Debtor's petition.

10.    The stores are located and operate throughout the United States, most often in strip malls.  Each store offers SculpSure, Venus, and/or Merz brand equipment that is used to perform cosmetic procedures.  The SculpSure and Venus equipment is owned by Debtor American Aesthetic Equipment, LLC, while the Merz equipment is owned by BCV.

11.    BCV provides management services to each of the stores, including providing marketing support.  Each store pays a monthly management fee to BCV, and these management fees are BCV's sole source of income.

12.    Each store operates with an average staff of three to five employees, led by a store director.  All of the employees providing services at the stores are employed by BCV, not by the individual stores.

## B.    Description of Debtors' Pre-Petition Liens

13.    The financing statements of record according to a UCC search conducted in Debtors' states of organization ("UCC Search") are the

following filings: (a) Fedor Fedorov; (b) McKesson Corporation, for itself and as collateral agent for each of its affiliates; (c) ML Factors Funding LLC; (d) Merz North America, Inc.; (e) Cynosure, Inc.; (f) MMPS-LRX, LLC; (g) Corporation Service Company, as representative; (h) Liberty Bank; and (i) UGA.

**Debtor Body Contour Ventures, LLC**

14.     Fedor Fedorov and Debtor BCV are parties to the Agreement Regarding Preferred Distributions dated January 13, 2017, under which Mr. Fedorov made a capital contribution to BCV to be repaid overtime.  The repayments are secured by BCV's tangible assets and accounts receivable. While BCV receives intercompany transfers, it does not have accounts receivable from third parties.  Fedorov filed a financing statement against BCV regarding this security interest on February 2, 2017, which financing statement was amended that same day.  Upon information and belief, Mr. Fedorov has a total claim of approximately $1,027,195.80.

15.     McKesson Corporation and non-Debtor "Body Contour Center" are parties to the "Negotiable Promissory Note (Fixed-Rate / Secured)" dated October 1, 2018 in the amount of $189,396.27, which purports to grant McKesson Corporation an all asset lien.  McKesson Corporation's alleged lien is invalid and unenforceable under 11 U.S.C. § 544 because,

among other reasons, the lien is in the name of and executed by "Body Contour Center," which is not a Debtor, while the financing statement regarding such lien was filed against BCV on October 4, 2018. Debtors plan to file an adversary proceeding to avoid this lien and to recover any avoidable transfers.

16.    ML Factors Funding Limited Liability Company and Debtor BCV are parties to a Future Receivables Agreement dated November 16, 2018 under which ML Factors Funding LLC purported to purchase a certain percentage of future accounts receivable from BCV. While BCV receives intercompany transfers, it does not have accounts receivable from third parties. This transaction is further invalid and unenforceable under 11 U.S.C. § 547(e) because, among other reasons, ML Factors Funding LLC did not file a UCC financing statement until December 31, 2018. Debtors plan to file an adversary proceeding to avoid this lien and to recover any avoidable transfers.

17.    Merz North America, Inc. and Debtor BCV are parties to the Purchase Agreement dated March 4, 2018 as amended by the First Amendment to Purchase Agreement dated October 15, 2018, and as further amended and restated as of January 9, 2019 by an Amended and Restated Purchase Agreement regarding the purchase of certain

equipment.  This transaction is invalid and unenforceable under 11 U.S.C. §§ 547 and 548.  Debtors may file an adversary proceeding to avoid this lien and recover any avoidable transfers.

18.     While it did not file a financing statement, Alpha Capital Source and Debtor BCV entered into a Revenue Purchase Agreement dated November 27, 2018 under which Alpha Capital Source purported to purchase a certain percentage of future accounts receivable from BCV. While BCV receives intercompany transfers, it does not have accounts receivable from third parties.  Alpha Capital Source did not file a financing statement regarding this transaction.  Debtors plan to file an adversary proceeding to avoid this lien and recover any avoidable transfers.

**Debtor American Aesthetic Equipment, LLC**

19.     Cynosure, Inc. and Debtor American Aesthetic Equipment, LLC are parties to the Purchase Agreement dated November 17, 2016, as amended by the First Amendment to Purchase Agreement dated May 22, 2017 and the Second Amendment to Purchase Agreement dated January 3, 2018, under which Debtor American Aesthetic Equipment, LLC purchased certain equipment from Cynosure, Inc. to use in Debtors' businesses.  Various financing statements were filed against Debtor American Aesthetic Equipment, LLC regarding such equipment between

May 11, 2016 and August 20, 2018.  Upon information and belief, Cynosure, Inc. has a total claim of $6,704,684.66, while the value of the equipment securing the claim is approximately $800,000.[3]

20.    Venus Concept USA Inc. and Debtor American Aesthetic Equipment, LLC entered into numerous agreements for the purchase of certain equipment under which Venus Concept USA Inc. purported to retain title to the equipment until receiving payment in full.  Such an arrangement amounts to a secured transaction requiring the filing of a financing statement, which Venus Concept USA Inc. did not do.  Debtors plan to file an adversary proceeding to avoid this lien and to recover any avoidable transfers.

**Other Debtors**

21.    The financing statement filed by MMPS-LRX, LLC on December 31, 2014 was filed against Debtor LRX Troy, LLC relating to certain equipment.  Upon information and belief, Debtor LRX Troy, LLC does not own any equipment and did not own any equipment on December 31, 2014.

22.    The financing statements filed by Corporation Service Company, as representative, on August 27, 2014 and September 25, 2014,

---

[3] Nothing in this Motion is an admission as to the validity, extent, enforceability, priority, or amount of any lien or claim.  Debtors reserve their rights to challenge any such liens or claims.

and by Liberty Bank on December 2, 2014, were filed against Debtor LRX Novi, LLC for certain equipment.  Upon information and belief, Debtor LRX Novi, LLC does not own any equipment and did not own any equipment at the time the financing statements were filed.

23.    The financing statement filed by UGA on October 18, 2018 was filed against Premier Laser Spa of Virginia LLC.  Upon information and belief, this was filed in anticipation of a loan that was never obtained.

24.    All of the parties identified as secured parties of record in the UCC Search have been provided with notice of the Motion, the Interim Hearing on the Motion, and the proposed Interim Order at the addresses provided in their financing statements of record.

## C.    The Need for § 364 Credit and the Insufficiency of Cash Usage Alone

25.    Debtors' use of its remaining cash, which is unencumbered, would be insufficient to enable Debtors to operate beyond this week. *See* Sekely Declaration ¶ 5.

26.    Debtors retained Conway MacKenzie, Inc. ("CM") as their financial advisor on January 18, 2019.   Since that time, CM has become familiar with the financial condition of Debtors, their operations, and their cash flows.  At Debtors' request, a 13-week, weekly cash forecast was prepared that begins with this week, the week ending March 3, 2019

("Budget"). The Budget is attached as Exhibit A to the Sekely Declaration. The Budget assumes no new debt (other than the incurrence of trade debt in the ordinary course and the DIP Facility) or equity financing, capital or other liquidity infusion (other than the collection of accounts in the ordinary course), and that Debtors have unrestricted access to 100% of their existing cash and future cash collections during the period covered by the Budget. The Budget demonstrates that without additional borrowings or capital infusion, Debtors will have insufficient cash collections and, therefore, insufficient cash to operate their businesses beyond this week, the week ending March 3, 2019, and as a result could not conduct a sale process and otherwise maximize going concern value under§ 363. *See* Sekely Declaration ¶¶ 3 and 5-8.

27.    Debtors would not be able to sustain their business operations solely with the use of cash and require additional liquidity to finance their current operations in the form of the § 364 financing requested in this Motion. *See* Sekely Declaration ¶ 9.

## E.    Efforts to Obtain § 364 Credit on More Favorable Terms

28.    While Debtors have spoken to other potential lenders for debtor-in-possession financing, the only party that is willing to make debtor-in-possession financing available on terms that Debtors reasonably believe

can be satisfied is the DIP Lender. *See* Sekely Declaration ¶ 10.

29.  Debtors courted their last expected combined source of debtor-in-possession financing and stalking horse, an unrelated/non-insider third party, for several months, only to have the expected financing source opt not to lend at beyond the eleventh hour in late January, 2019. *See* Sekely Declaration ¶ 11

30.  Generally, the DIP Lender proposes financing Debtors' projected cash needs of up to a maximum amount of $1,700,000 per the Budget through an anticipated § 363 sale closing date to occur no later than May 24, 2019.  This financing would occur under §§ 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code.  The DIP Facility does not contemplate cross-collateralization.  The DIP Facility is also proposed to be used as the deposit for the DIP Lender as the Stalking Horse Bidder in an Asset Purchase Agreement.

31.  It would be time consuming, expensive, and ultimately futile for Debtors to further attempt to obtain approval for financing with a lender other than the DIP Lender.  Debtors are unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under § 503(b)(1) of the Bankruptcy Code, as an administrative expense under §§ 364(a) or 364(b) of the Bankruptcy Code, or on terms otherwise more favorable than

those terms offered by the DIP Lender. *See* Sekely Declaration ¶ 12.

Consequently, the proposed financing is on the best terms under the

circumstances.

## **RELIEF REQUESTED**

32.     Debtors request the entry of the Interim Order and Final Order

authorizing them to borrow money and obtain credit from the DIP Lender

under the DIP Facility, the documents to be executed in connection with the

DIP Facility, and the DIP Orders.  The following are the salient terms of the

proposed DIP Facility and the proposed Interim Order granting this Motion

on an interim basis:[4]

> (a)     **Maximum Amount:** The maximum amount available
> under this credit facility (the "DIP Facility") at any one time
> outstanding shall be $1,700,000.00 (the "Maximum
> Amount")[5].  The DIP Lender shall have no obligation to
> fund any amounts in excess of the Maximum Amount.

> (b)     **Interim Financing:** Prior to entry of a final non-
> appealable order (the "Final Order") approving the DIP
> Facility, the DIP Lender will  provide up to $1,170,000.00
> in interim financing subject to the entry of an order of the
> Bankruptcy Court approving the same ("Interim Order");
> provided that, DIP Lender has advanced $170,000 to
> Borrowers pre-petition to cover the chapter 11 petition

---

[4] This is a summary of the terms of the proposed DIP Facility and Interim
Order.  Only actual terms of the proposed DIP Facility and Interim Order
should be relied upon.

[5] As of Friday, February 22, 2019, DIP Lender had raised $645,000 and
has firm commitments from its investor group to fund the balance of the
Maximum Amount.

filing fees, critical payroll, and professional fees to secure retention of Debtors' professionals, and will initiate a wire of $50,000 to Wolfson Bolton PLLC and $55,000 to Conway MacKenzie, Inc. per the wire instructions provided by both professionals within 24 hours after the filing of the chapter 11 petitions to cover their respective first week of professional fee amounts provided for under the Budget, before the entry of the Interim Order (first week's professional fees to be held by the professionals in accordance with the terms of the Term Sheet), which advances shall be treated as funds advanced under the Interim Order; provided, further, that if, for any reason, the Interim Order fails to be entered in accordance with the Term Sheet, thus triggering an Event of Default, the professionals will promptly remit to DIP Lender the first week's professional fee advance net of reasonable necessary fees for services rendered prior to receipt of written notice of the Event of Default from DIP Lender. In no event shall the first week's professional fee advance be deemed property of the Debtors' estates if the Interim Order fails to be entered. The Interim and Final Orders shall be in form and substance reasonably acceptable to the DIP Lender, consistent with the terms hereof and containing such other terms and provisions as shall adequately protect the interests and claims of DIP Lender.

(c) **Maturity Date:** The earlier of (i) May 24, 2019, (ii) the occurrence of an Event of Default (as defined below); or (iii) the closing of a § 363 Sale pursuant to an order authorizing a sale of substantially all of the Debtors' assets (the "Maturity Date"), The Maturity Date may only be extended with the written consent of the DIP Lender in its sole discretion. The DIP Lender shall have no further obligation to provide financing on or after the Maturity Date.

The commitment in respect of the DIP Facility shall expire on the Maturity Date and all amounts outstanding under the DIP Facility, including, without limitation, interest, fees

and expenses chargeable to the DIP Facility as provided hereunder (collectively, the "Obligations") shall be repaid in full no later than the Maturity Date without the DIP Lender being required to make demand upon Borrowers or Guarantors or to give notice that the DIP Facility has expired and the Obligations are due and payable. Any confirmation order entered in connection with a liquidation or reorganization plan shall not discharge or otherwise affect in any way any of the Obligations of Borrowers and Guarantors to the DIP Lender under the DIP Facility or the Borrowers' or Guarantors' obligations to the DIP Lender under the Interim Order or the Final Order, other than after payment in full in cash to the DIP Lender of all Obligations under the DIP Facility on or before the effective date of any such plan.

(d)  **Interest Rate:** Interest on the DIP Facility shall accrue at the rate of 12% per annum on the outstanding day-to-day principal balance. Upon the occurrence and during the continuance of any Event of Default, the Borrowers' Obligations under the DIP Facility will accrue interest at a rate of 2.0% per annum above the otherwise applicable interest rate. Interest shall be calculated daily for fee actual number of days elapsed in the period during which it accrues based on a year of 365/366 days, as applicable.

(e)  **DIP Security and Claims:** All Obligations of Borrowers and Guarantors to the DIP Lender shall be secured by valid, perfected and enforceable liens and security interests (the "DIP Facility Liens") in all pre- and post-petition property of the Debtors, other than avoidance causes of actions arising on or after the Petition Date under the provisions of chapter 5 of the Bankruptcy Code and subject to the Carve-Out (defined below), with the following priorities: (a) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected lien and security interest upon all of the Debtors' property that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date, and (b) pursuant to

section 364(c)(3), best available junior, perfected liens and security interests upon all of the Debtors' property that is subject to valid, binding, enforceable and perfected liens of the secured claims that existed as of the Petition Date.

All Obligations to the DIP Lenders shall enjoy super-priority administrative expense status under 11 USC §364(c)(l) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code ("Super-priority Claim"), subject only to the Carve-Out (defined below).

The DIP Facility Liens and priorities provided to the DIP Lender shall be subject to a carve-out (the "Carve-Out") for the payment of (1) Court-allowed and unpaid professional fees, expenses, and disbursements in amounts not to exceed the line items allocated to each professional under the Budget (in the aggregate, the "Professional Expense Cap"), and (2) the payment of fees pursuant to 28 U.S.C. § 1930 ("UST Fees"); provided, that so long as neither the Maturity Date nor an Event of Default (defined below) that results in a termination of the DIP Facility has occurred, (i) Borrowers will fund each professional's weekly allocated amount under the Budget in advance, which each professional will hold in trust for application to the professional's invoices when allowed by the Court, and Borrowers will be permitted to pay allowed UST Fees as the same are due and payable in an amount not to exceed those set forth in the Budget; and (ii) payments of professional fees and UST Fees shall not reduce the amount of the Carve-Out. During the continuance of an Event of Default (defined below) under the Term Sheet or a default under the Interim Order or the Final Order, as the case may be, any payments actually made to such professionals during such continuance shall reduce the Professional Expense Cap on a dollar-for-dollar basis.

(f) **Guaranty**: Guarantors unconditionally and irrevocably guarantee to DIP Lender the prompt payment, when due or declared due, all indebtedness and liabilities of Borrowers to DIP Lender under the Term Sheet. The obligation of Guarantors shall be unconditional and absolute without any defense, setoff or counterclaim which Guarantors may assert.

(g) **Events of Default:** The occurrence of any one or more of the following events shall constitute an event of default ("Event of Default") unless otherwise waived in writing by the DIP Lender:

(i) Borrowers materially breach any of the terms and conditions or covenants of the Term Sheet, or fail to pay the Obligations, including, but not limited to, principal, interest and fees when due;

(ii) Actual cumulative sales generated for the first 4 weeks from the Petition Date are, in the sole reasonable opinion of DIP Lender, materially less than the same period cumulative sales projected in the Budget;

(iii) The appointment of a receiver, chapter 11 trustee, interim receiver, examiner with enlarged powers, or similar official, other than at the direction or with the support of the DIP Lender, or the chapter 11 case is converted to a case under chapter 7 of the Bankruptcy Code;

(iv) Except for the Carve-Out and as otherwise expressly provided by the Term Sheet, the entry of an order granting any other claim superpriority status or a lien equal or superior to that granted to the DIP Lender pursuant to the DIP Order;

(v) The date of entry of an order amending, supplementing, staying, vacating or otherwise

modifying the DIP Facility or the Term Sheet without the consent of the DIP Lender;

(vi)    The date of any attempt by any party to invalidate, reduce or otherwise impair the DIP Lender's post-petition liens and claims;

(vii)    The filing by Borrowers (or with the consent or support of Borrowers) of any reorganization or liquidation plan that is not sponsored by the DIP Lender or is inconsistent with the Term Sheet (the "Reorganization Plan");

(viii)    Confirmation of a Reorganization Plan on terms which alter the terms of the Term Sheet in any matter not acceptable to the DIP Lender, in its sole discretion;

(ix)    The Debtors cease or threaten to cease to carry on business in the ordinary course, except where such cessation occurs in connection with a sale of all or substantially all of the assets of the Debtors or other restructuring or reorganization of the Debtors which has been consented to by the DIP Lender;

(x)    Any representation or warranty by Borrowers shall be incorrect or misleading in any material respect when made;

(xi)    Borrowings under the DIP Facility exceed the Maximum Amount;

(xii)    the failure of Borrowers to file a motion to sell substantially all of the Debtors' assets to DIP Lender or its designee pursuant to § 363 of the Bankruptcy Code ("363 Sale") and to establish sale procedures within 5 days of the Petition Date;

(xiii)    the failure of Borrowers to obtain entry of an order establishing the sale procedures ("Sales

Procedures Order") for the 363 Sale of substantially all of the Debtors' assets, in form reasonably acceptable to DIP Lender, within 10 days of the Petition Date;

(xiv) the failure of Borrowers to obtain entry of a final, non-appealable order approving the sale of substantially all of the Debtors' assets ("Sale Order") to DIP Lender, subject to any higher and better bid of the third party, within 80 days of the Petition Date; or

(xv) the failure of Borrowers to close on the 363 Sale of substantially all of the Debtors' assets to DIP Lender or any third party that submitted the highest and best bid by May 24, 2019.

Upon the occurrence of an Event of Default, the DIP Lender may, at its option, terminate the DIP Facility and declare all amounts outstanding immediately due and payable.

(h) **Indemnity:** Borrowers and Guarantors shall indemnify and hold harmless the DIP Lender and officers, directors, fiduciaries, employees, agents, advisor, attorneys, and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, fees and disbursements of counsel) in connection with any investigation, litigation, or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in the Term Sheet, other than for the DIP Lender's own gross negligence or willful misconduct.

(i) **Credit Bid:** The DIP Lender has the right to offset all or any portion of the outstanding Obligations under the DIP Facility in any sale of the Debtors' assets or consideration to be provided by DIP Lender under any Reorganization Plan.

(j) **Automatic Perfection:** The DIP Facility Liens will automatically perfect.

(k) **506(c) Waiver:** Section 506(c) rights to surcharge the DIP Facility Collateral are prohibited.

(l) **Section 364(e) Good Faith Protection:** The DIP Lender is entitled to the protections of Section 364(e) of the Bankruptcy Code.

## BASIS FOR RELIEF

### A.    Debtor-in-Possession Financing

33.    Section 364(c) of the Bankruptcy Code provides that if a debtor-in-possession is unable to obtain unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code as an administrative expense, the court, after notice and a hearing, may authorize the debtor-in-possession to obtain credit or incur debt (1) with priority over any or all administrative expenses of the kind specified in §§ 503(b) or 507(b); (2) secured by a lien on property of the estate that is not otherwise subject to a lien; or (3) secured by a junior lien on property of the estate that is subject to a lien.

34.    Debtors satisfy the requirements of § 364(c) of the Bankruptcy Code because (a) Debtors are unable to obtain unsecured credit or unsecured debt allowable under § 503(b)(1) of the Bankruptcy Code, as an administrative expense under §§ 364(a) or 364(b) of the Bankruptcy Code, or on terms otherwise more favorable than those terms offered by the DIP

Lender, and (b) the proposed DIP Facility is in the best interest of the bankruptcy estates.

35.     In Debtors' business judgment, the DIP Facility represents the best financing option to effectuate the purposes and advance Debtors' reorganization efforts in implementing and consummating a § 363 sale in order to maximize value to the estate.

36.     Likewise, the interest rate and fees required under the DIP Facility are reasonable and appropriate under the circumstances.  Indeed, courts routinely authorize lender incentives that extend well beyond the specific liens and rights specified in § 364 of the Bankruptcy Code and those proposed to be granted to the DIP Lender in the Interim Order.

37.     Having determined that financing is available only under § 364(c) of the Bankruptcy Code, Debtors negotiated the DIP Facility at arm's-length and pursuant to their business judgment, which is to be accorded great weight so long as it does not run afoul of the provision of and policies underlying the Bankruptcy Code. *See, e.g.*, *S. Bank Tr. Nat'l Ass'n v. Am. Airlines, Inc. (In re AMR Corp.)*, 485 B.R. 279, 287 (Bankr. S.D.N.Y. 2013) ("In determining whether to approve a debtor's request under Section 364, a Court must examine whether the relief requested is an appropriate exercise of the debtor's business judgment.").

38.     Debtors' efforts described elsewhere in this Motion and in the Sekely Declaration more than satisfy the standard that has been established in the case law.

39.     The DIP Facility is clearly for the benefit of Debtors' bankruptcy estates and creditors. The DIP Facility is critical to maintaining Debtors' operations and, thus, preserving and enhancing Debtors' going concern value.  As evidenced by the Budget, use of cash alone is insufficient to pay even the normal operating expenses of Debtors. *See* Sekely Declaration ¶ 5. With the additional liquidity provided by the DIP Facility, Debtors will be able to maintain ongoing operations, thereby permitting them to generate revenues, pay their employees, and operate their businesses for the benefit of all parties-in-interest while pursuing an orderly § 363 sales process.

40.     The terms and conditions of the DIP Facility are fair and reasonable and were negotiated by the parties in good faith and at arm's-length.  Accordingly, the DIP Lender should be accorded the benefits of § 364(e) of the Bankruptcy Code with respect of the DIP Facility.

## B.     The Interim Approval Should Be Granted

41.     Bankruptcy Rule 4001(c) provides that a final hearing on a motion to obtain credit pursuant to § 364 may not be commenced earlier than 14 days after service of such motion.  Upon request, however, the

Court is empowered to conduct a preliminary expedited hearing on the motion and authorize obtaining credit to the extent necessary to avoid immediate and irreparable harm to the debtor's estate.

42. On an interim basis, Debtors request that this Court authorize Debtors to borrow and use up to $1,170,000 during the next thirty days. This amount anticipates a final hearing on the Motion on or before the end of the thirty-day period and that the Court approves the financing on the terms requested in the Interim Order. Debtors must have the interim relief requested in the Interim Order to maintain and operate their businesses. Absent such relief, Debtors will be unable to meet their payroll obligations or to preserve and protect their assets and the value of those assets, and operations will cease. *See* Sekely Declaration ¶ 13. Debtors have inadequate cash to operate and pay necessary expenses of the Bankruptcy Cases and to move forward with a sale process, absent the proposed DIP Facility being approved on an interim expedited basis. *See* Sekely Declaration ¶¶ 5, 8. As a result, Debtors need the DIP Facility and the amount requested on an interim basis to avoid immediate and irreparable harm to Debtors' bankruptcy estates until a final hearing can be held. Absent access to the DIP Facility, Debtors' businesses will simply shut down and their employees will have to be terminated and customers not

provided services. *See* Sekely Declaration ¶ 13.

43.     Debtors request, pursuant to Bankruptcy Rule 4001(c), that the Court authorize Debtors, from and after the entry of the Interim Order, until an order is entered following the Final Hearing on the Motion, to obtain credit under the DIP Facility.  This will enable Debtors to maintain ongoing operations and the means by which they may avoid immediate and irreparable harm and prejudice to their bankruptcy estates, all parties-in-interest and Debtors' customers, pending the Final Hearing.

## NOTICE

### A.     Notice with Respect to Interim Hearing on the Motion

44.     Notice of this Motion, the interim hearing and the relief proposed to be granted in the Interim Order has been provided (by hand, fax, overnight mail, email, or courier) to the United States Trustee, Debtors' top 30 largest unsecured creditors, counsel to DIP Lender, all creditors believed to have an interest in the DIP Collateral, all parties who filed requests for notice pursuant to Bankruptcy Rule 2002, all parties appearing of record in the UCC Search, and all governmental agencies having taxing authority over Debtors.  Debtors submit that, under the circumstances, no further notice of the hearing on the interim financing is necessary and request that any further notice be dispensed with and waived.

**B.     Notice with Respect to Final Hearing on the Motion**

45.     Debtors respectfully request that the Court set a final hearing date on the Motion for a date within 21 days after entry of the Interim Order, and authorize Debtors to serve a copy of this Motion and the Interim Order which fixes the time and date for filing objections to this Motion, by first class mail upon (a) counsel to the unsecured creditors' committee, if any; (b) the creditors included on the list filed under Rule 1007(d); (c) the Office of the United States Trustee; (d) counsel to the DIP Lender; (e) all parties appearing of record in the UCC Search or otherwise known to Debtors to have or assert liens on or security interests in any of Debtors' assets; (f) the Internal Revenue Service; (g) all governmental agencies having taxing authority over Debtors, and (h) all parties who have timely filed requests for notice under Bankruptcy Rule 2002.  Debtors request that the Court deem such notice of the final hearing to be sufficient notice under Bankruptcy Rule 4001.

## REQUEST FOR RELIEF

WHEREFORE, Debtors respectfully request that the Court (a) enter the Interim Order, in the form attached as <u>Exhibit 1</u>, which, among other relief, (i) authorizes Debtors to enter into the DIP Facility; (ii) authorize, on an interim basis, Debtors to borrow up to $1,170,000, and on a final basis,

Debtors to borrow up to $1,700,000, under the DIP Facility from the DIP Lender on a senior secured, superpriority, administrative expense claim basis, including the grant of liens under §§ 364(c)(2) and 364(c)(3) and a superpriority administrative expense claim under § 364(c)(1); and (iii) establish notice procedures and schedule the Final Hearing on this Motion for approval of the DIP Facility; and (b) grant such other and further relief as the Court deems just and equitable.

Respectfully submitted,

WOLFSON BOLTON PLLC
Proposed Counsel to Debtors

Dated:  February 25, 2019          By:   /s/ Scott A. Wolfson
                                        Scott A. Wolfson (P53194)
                                        Anthony J. Kochis (P72020)
                                        Thomas J. Kelly (P78754)
                                   3150 Livernois, Suite 275
                                   Troy, MI  48083
                                   Telephone: (248) 247-7103
                                   Facsimile: (248) 247-7099
                                   Email: swolfson@wolfsonbolton.com

Exhibit 1

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Body Contour Ventures, LLC, | Case No. 19-42510-pjs |
| Debtor. | Hon. Phillip J. Shefferly |

**ORDER (I) AUTHORIZING DEBTORS TO OBTAIN POSTPETITION**
**FINANCING ON A SENIOR SECURED, SUPERPRIORITY BASIS,**
**AND (II) SCHEDULING A FINAL HEARING**

Upon the emergency motion (the "Motion") of the debtors and debtors-

in-possession identified below (the "Debtors")[1] in their respective chapter 11

---

[1] This Order is applicable to Debtors Body Contour Ventures, LLC, Case No. 19-42510, BCA Acquisitions, LLC, Case No. 19-42511, American Aesthetic Equipment, LLC, Case No. 19-42512, Knoxville Laser Spa LLC, Case No. 19-42513, LRX Alexandria, LLC, Case No. 19-42514, LRX Birmingham, LLC, Case No. 19-42515, LRX Charlotte, LLC, Case No. 19-42516, LRX Chicago, LLC, Case No. 19-42517, LRX Colorado Springs, LLC, Case No. 19-42518, LRX Dearborn, LLC, Case No. 19-42519, LRX East Lansing, LLC, Case No. 19-42520, LRX Grand Blanc, LLC, Case No. 19-30413, LRX Hoffman Estates, LLC, Case No. 19-42521, LRX Las Vegas Summerlin, LLC, Case No. 19-42522, LRX Mesa, LLC, Case No. 19-42523, LRX Naperville, LLC, Case No. 19-42524, LRX Novi, LLC, Case No. 19-42525, LRX Orland Park, LLC, Case No. 19-42526, LRX Plymouth-Canton, LLC, Case No. 19-42527, LRX Stone Oak, LLC, Case No. 19-42528, LRX Towson, LLC, Case No. 19-42530, LRX Troy, LLC, Case No. 19-42531, Premier Laser Spa of Greenville LLC, Case No. 19-42532, Premier Laser Spa of Indianapolis LLC, Case No. 19-42533, Premier Laser Spa of Louisville LLC, Case No. 19-42534, Premier Laser Spa of Pittsburgh LLC, Case No. 19-42535, Premier Laser Spa of St. Louis LLC, Case No. 19-42536, and Premier Laser Spa of Virginia LLC, Case No. 19-42537.

cases (collectively with any successor case, the "Cases"), seeking pursuant to sections 105, 362, 363(c)(2), 364(c)(1), 364(c)(2), and 364(c)(3) of title 11 of the United States Code, (as amended, the "Bankruptcy Code"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure, and Rules 4001-2 and 9013-1 of the Local Bankruptcy Rules, the entry of an interim and final order: (I) authorizing the Debtors to obtain postpetition financing pursuant to a debtor-in-possession credit facility (as amended, supplemented or otherwise modified from time to time, the "DIP Facility") under the Term Sheet[2] between the Debtors Body Contour Ventures, LLC, BCA Acquisitions, LLC and American Aesthetic Equipment, LLC, as borrowers (the "Borrowers"), all Debtor subsidiary companies, as guarantors (the "Guarantors"), and RVB Investment Group, LLC, as lender (the "DIP Lender"), and pursuant to which the Borrowers are seeking authorization to borrow up to, in the aggregate, the principal amount of $1,700,000, which, together with all interest, fees, and expenses due and payable under the DIP Facility (the "Obligations"), to be (A) secured by first priority senior secured liens on all property of the Debtors that is not otherwise subject to a lien

_____

[2] Capitalized terms used but not defined have the meanings given to them in the *Emergency Motion for Interim and Final Orders Authorizing Debtors to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis and Scheduling a Final Hearing* ("Motion").

pursuant to section 364(c)(2), subject only to the Carve-Out (as defined below), (B) secured by best available junior liens pursuant to section 364(c)(3) on all assets of the Debtors that are subject to (i) valid and perfected prepetition liens, (ii) Permitted Liens (as defined below), and (iii) the Carve-Out, and (C) granting the DIP Lender superpriority administrative claims in the Cases pursuant to section 364(c)(1) of the Bankruptcy Code senior in right of payment over any and all administrative expenses of the kinds specified in sections 503(b) and 507(a) of the Bankruptcy Code or otherwise, subject only to Permitted Liens and the Carve-Out, (II) scheduling a final hearing (the "<u>Final Hearing</u>") to consider entry of an order (the "<u>Final Order</u>") approving the relief requested in the Motion on a final basis, and (III) approving the form of notice with respect to the Final Hearing.

The Court having considered the Motion and the exhibits attached thereto; the Morgan Declaration and the Sekely Declaration, submitted in support hereof; a hearing having been held and concluded on February ____, 2019 before this Court (the "<u>Interim Hearing</u>"); and upon the entire record made at the Interim Hearing; and after due deliberation and sufficient cause appearing therefor:

IT IS HEREBY FOUND AND CONCLUDED that:

(A)    On February 22, 2019 (the "<u>Petition Date</u>"), each Debtor filed a

voluntary petition for relief with this Court under chapter 11 of the Bankruptcy Code, thereby commencing the Cases. The Debtors are continuing in possession of their property, and operating and managing their businesses as debtors-in-possession, pursuant to sections 1107 and 1108 of the Bankruptcy Code.

(B)     This Court has jurisdiction over these proceedings and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334. Consideration of this Motion constitutes a core proceeding as defined in 28 U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

(C)     Telephone, email, facsimile, or overnight mail notice of the Interim Hearing and the entry of this Order has been provided to: (i) the Office of the United States Trustee (the "U.S. Trustee"); (ii) the creditors holding the 30 largest unsecured claims against the Debtors (considered on a consolidated basis); (iii) counsel to the DIP Lender; (iv) known holders of prepetition liens against the Debtors' property; (v) appropriate state and federal taxing authorities; and (vi) any person who has filed a request for notice in the above-captioned cases pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). The requisite notice of the Motion and the relief requested thereby and this Order has been provided in accordance with Bankruptcy

Rule 4001, which notice is sufficient for all purposes under the Bankruptcy Code, including, without limitation, sections 102(1) and 364 of the Bankruptcy Code, and no other notice need be provided for entry of this Order.

(D)     The relief requested by the Motion is necessary to avoid immediate and substantial harm to the Debtors' estates, and good, adequate and sufficient cause has been shown to justify the granting of the relief requested herein, and the immediate entry of this Order.

(E)     The Debtors do not have sufficient available resources of working capital and financing to carry on the operation of their businesses without the DIP Facility.  The Debtors have an immediate need to obtain financing under the DIP Facility in order to permit, among other things, the Debtors to pay employees and to continue their business operations in an orderly manner, maintain business relationships with vendors, suppliers, and customers, and satisfy other working capital and operational needs.

(F)     The Debtors are unable to obtain unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code as an administrative expense or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.  Financing on a post-petition basis is not available to the Debtors unless the Debtors grant: (i) the DIP Facility Liens (as defined below) under the DIP Facility, pursuant to sections 364(c)(2), and 364(c)(3) of the Bankruptcy Code, to

secure the Obligations, and (ii) pursuant to section 364(c)(1) of the Bankruptcy Code, the Superpriority Claims in respect of the Obligations. The DIP Lender has indicated a willingness to make such loans and advances and provide such other financial accommodations pursuant to the terms and conditions set forth in the Term Sheet. The Debtors are otherwise unable to obtain financing on more favorable terms from sources other than the DIP Lender under the DIP Facility and, in the absence of the DIP Facility, will be forced to promptly terminate operations and their employees and liquidate.

(G)   The DIP Facility has been negotiated in good faith and at arms-length by the Debtors, in their respective capacities as the Borrowers and the Guarantors, and the DIP Lender, and any credit extended and loans made to the Borrowers pursuant to the DIP Facility used by the Borrowers for the benefit of all the Debtors shall be deemed to have been extended, issued, made, or used as the case may be, in good faith as required by, and within the meaning of, section 364(e) of the Bankruptcy Code, and the DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

(H)   The terms of the DIP Facility and this Order are fair and reasonable, and reflect the Debtors' exercise of prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

(I)     Entry of this Order is in the best interests of the Debtors' estates and creditors because its implementation, among other things, will allow for the Debtors to remain in business by providing for interim working capital which is necessary to sustain the operations of the Debtors' existing businesses and provide the appropriate care and safety to its customers, including their immediate payroll and other critical interim working capital needs.  Absent the entry of this Order, the Debtors' estate would be immediately and irreparably harmed.

(J)     Each of the foregoing findings by the Court will be deemed a finding of fact if and to the full extent that it makes and contains factual findings, and will be deemed a conclusion of law if and to the full extent that it makes and contains legal conclusions.

Based upon the foregoing findings and conclusions, and upon the record made by the Debtors before this Court at the hearing on the Motion, and good and sufficient cause appearing therefor,

IT IS HEREBY ORDERED that:

1.      The Motion is granted, subject to the terms and conditions set forth in this Order.

2.      All objections, if any, to the Motion are resolved hereby or, to the extent not resolved, are overruled.

3.     The Term Sheet is approved in all respects and is incorporated into this Order by reference.

4.     The Debtors are authorized and obligated to comply with and perform, and are bound by, all of the terms, conditions, and waivers contained in the Term Sheet and this Order, and the Debtors are authorized, directed, and obligated to repay amounts borrowed, with interest, fees, and expenses, and any other allowed charges and amounts, to the DIP Lender in accordance with and subject to the terms and conditions set forth in the Term Sheet and this Order.  None of any documents related to the DIP Facility, any provision thereof, any right arising under any thereof, shall be voidable or avoidable under section 548 of the Bankruptcy Code, under any applicable state Uniform Voidable Transaction Act, Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law, or otherwise. The Debtors are further authorized, obligated, and directed to timely pay all fees and expenses, including, without limitation, all reasonable fees and expenses of professionals engaged by the DIP Lender without any further order of this Court, in accordance with the terms of the Term Sheet, and to fund each Debtors' professional's weekly allocated amount under the Budget in advance, which each professional will hold in trust for application to the professional's invoices when allowed by the Court.  None of the fees and

expenses of the professionals engaged by the DIP Lender payable pursuant to this paragraph shall be subject to separate approval by this Court (but this Court shall resolve any dispute as to the reasonableness of any such fees and expenses), and no recipient of any such payment shall be required to file any interim or final fee application with respect thereto; provided, however, that simultaneously with providing the Debtors with copies of reasonably detailed statements for such legal fees and expenses, such professionals shall provide the same materials to the Office of the United States Trustee. To the extent that any party in interest believes that amounts payable to DIP Lender's professionals are unreasonable or excessive, such party in interest, including, without limitation, the Office of the United States Trustee, may attempt to delay the payment of such professional fees and expenses or, if such amounts have already been paid, seek other relief from the Court regarding such payments consistent with this Order and the Term Sheet. The Debtors are expressly authorized and empowered to execute and deliver any other document of any kind required to be executed and delivered in connection with the DIP Facility.

5.      The Debtors are expressly authorized to immediately borrow from the DIP Lender, on the terms and subject to the conditions set forth in the Term Sheet and this Order, up to $1,700,000 in the aggregate, with

$1,170,000 on an interim basis.  All such loans shall be advanced via wire transfer to the designated bank account of the Debtor Body Contour Ventures, LLC pursuant to wire transfer instructions to be provided by Debtors to the DIP Lender.

6.      The Borrowers are authorized to use the proceeds of the DIP Facility for working capital needs and to pay operating costs and expenses of the Debtors for the period ending on the Maturity Date of the DIP Facility in accordance with the Term Sheet and the Budget attached to the Term Sheet.

7.      Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Obligations shall constitute allowed claims (the "Superpriority Claims") against the Debtors with priority over any and all administrative expenses and all other claims against the Debtors, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, which allowed claims shall be payable from and have recourse to all pre and post-petition property of the Debtors and all proceeds thereof, excluding Avoidance Actions (defined below) and the proceeds and recoveries from Avoidance Actions), subject in all cases only to the Permitted Liens and the Carve-Out to the extent specifically provided for herein and in the Term Sheet.

{00080253.DOCX 6 }

8.     As security for the Obligations, the DIP Lender shall have and is hereby granted (effective upon the date of this Order and without the necessity of the execution by the Debtors of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected security interests in, and liens (the "Liens"), on all currently owned or hereafter acquired property and assets of the Debtors of any kind and nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all, proceeds, products, rents and profits thereof, including, without limitation, all cash, accounts, chattel paper, deposit accounts, documents, equipment, general intangibles, instruments, investment property, letters of credit rights, vehicles, goods, accounts receivable, inventory, cash-in-advance deposits, real estate, machinery, intellectual property (including trademarks and trade names), licenses, causes of action, rights to payment including tax refund claims, insurance proceeds and tort claims and the proceeds, products, rents and profits of all of the foregoing ("DIP Facility Collateral"), including, without limitation, all cash or checks on hand, all cash or securities deposited into any account maintained by the Debtors and the proceeds of all causes of action (other than causes of action arising on or after Petition Date under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code ("Avoidance

Actions") and the proceeds and recoveries therefrom) with the following priorities:

(a) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected Lien upon all of the Debtors' right, title and interest in, to, and under the DIP Facility Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date;

(b) pursuant to section 364(c)(3), a best available junior, perfected Lien upon all of the Debtors' right, title, and interest in, to and under all DIP Facility Collateral subject only to a Permitted Lien.

The foregoing Liens are referred to herein as the "DIP Facility Liens." Except to the extent expressly set forth in this Order, including the Carve-Out, the Liens granted pursuant to this Order and the Term Sheet to the DIP Lender to secure the Obligations shall not be subordinated to or made *pari passu* with any other lien or security interest under section 364(d) of the Bankruptcy Code. "Permitted Liens" means (a) liens for unpaid taxes that are not yet due and payable and that arise and are senior to the DIP Facility Liens by operation of law, (b) purchase money security interests and liens of lessors under capital leases, (c) easements, rights of way, covenants, conditions, zoning variances, and similar encumbrances that do not materially interfere

with the use or value of the property subject thereto, (d) mechanic's, materialmen's, warehousemen's, or similar liens that arise and are senior to the DIP Facility Liens and prepetition liens by operation of law, and (e) liens and encumbrances that are valid, binding, enforceable and perfected liens existing on the Petition Date. Notwithstanding anything to the contrary in this Order, nothing in this Order shall prevent any party from challenging the amount, validity, priority, enforceability, or extent of any prepetition liens or claims.

9. The DIP Facility Liens shall be subject to a carve-out (the "Carve-Out") for the payment of (1) Court-allowed and unpaid professional fees, expenses, and disbursements in amounts not to exceed the line items allocated to each professional under the Budget (in the aggregate, the "Professional Expense Cap"), and (2) the payment of fees pursuant to 28 U.S.C. § 1930 ("UST Fees"); provided, that so long as neither the Maturity Date nor an Event of Default (defined below) that results in a termination of the DIP Facility has occurred, (i) Borrowers may borrow under the DIP Facility to fund each professional's weekly allocated amount under the Budget in advance, which each professional will hold in trust for application to the professional's invoices when allowed by the Court, and Debtors will be permitted to pay allowed UST Fees as the same are due and payable in an

amount not to exceed those set forth in the Budget; and (ii) payments of professional fees and UST Fees shall not reduce the amount of the Carve-Out. During the continuance of an Event of Default (defined below) under this Term Sheet or a default under the Interim Order or the Final Order, as the case may be, any payments actually made to such professionals during such continuance shall reduce the Professional Expense Cap on a dollar-for-dollar basis.

10.     Upon entry of, and to the extent provided in, the Final Order, neither the Debtors nor their estates may assert a claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization by the DIP Lender upon the DIP Facility Collateral. The DIP Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Facility Collateral.

11.     All DIP Facility Liens shall be valid, binding and perfected automatically upon the entry of this Order. The DIP Lender shall not be required to file or serve financing statements, mortgages, notices of lien, or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect the DIP Facility Liens. If, however, the DIP Lender in its

reasonable discretion, shall determine to file any such financing statements,

mortgages, agreements, notices of lien, or similar instruments, or to otherwise

confirm perfection of the DIP Facility Liens, the Debtors, at the Debtors'

expense to the extent provided for in the Budget, are hereby authorized,

directed, and obligated to cooperate with and assist in such process to the

extent provided in the Term Sheet or this Order, and all such documents shall

be deemed to have been perfected at the time of and on the date of this

Order, with the priorities set forth herein, and shall be and hereby are deemed

and adjudicated senior to any other post-petition filing by any other person or

entity with respect to the same collateral.  A certified copy of this Order may,

in the discretion of the DIP Lender, be filed with or recorded in filing or

recording offices in addition to or in lieu of such financing statements,

mortgages, notices of lien or similar instruments, and all filing offices are

hereby authorized to accept such certified copy of this Order for filing and

recording.  Any provision of any lease or other license, contract or other

agreement that requires (i) the consent or approval of one or more landlords

or other parties or (ii) the payment of any fees or obligations to any

governmental entity, in order for the Debtors to pledge, grant, sell, assign, or

otherwise transfer any such leasehold interest, or the proceeds thereof, or

other post-petition collateral related thereto shall have no force and effect with

respect to the transactions granting post-petition liens in the proceeds of any assignment and/or sale of leasehold interests by any Debtor in accordance with the terms of this Order.

12.   Upon the occurrence of and during the continuance of an Event of Default under the DIP Facility, the DIP Lender is entitled to exercise rights and remedies and take all or any of the following actions without further relief from the automatic stay pursuant to section 362(a) of the Bankruptcy Code or any other applicable stay or injunction (which have been modified and vacated, as heretofore ordered, to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court: (a) terminate its obligation to make advances under the DIP Facility; (b) declare the principal of and accrued interest, fees, and other liabilities constituting the Obligations to be immediately due and payable; (c) charge a default rate of interest as set forth in the Term Sheet; and/or (d) take any other action or exercise any other right or remedy permitted to the DIP Lender under the Term Sheet, this Order, or by operation of law; provided, however, that the DIP Lender may not exercise its rights under clause (d) without first providing to counsel for the Debtors, counsel for any committee, and the U.S. Trustee five days' written notice (an "Enforcement Notice") of any such Event of Default and the proposed

exercise of rights and remedies. The Debtors waive any right to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the DIP Lender set forth in this Order and in the Term Sheet. If the Debtors or any other person challenge the occurrence of an Event of Default, any such person may request an expedited hearing before this Court (subject to the Court's availability) and the DIP Lender shall be permitted immediately to take any action described in clauses (a), (b), and (c) above, but unless the Court orders otherwise, the DIP Lender shall not take the actions described in clause (d) above pending any such hearing.

13. So long as the Debtors remain in control of the DIP Facility Collateral, (i) the DIP Lender shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Facility Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (ii) all risk of loss, damage or destruction of the DIP Facility Collateral shall be borne by the Debtors.

14. The Debtors are authorized and directed to perform all acts, and

execute and comply with the terms of such other documents, instruments, and agreements in addition to the Term Sheet as the DIP Lender may reasonably require as evidence of and for the protection of the Obligations, or which otherwise may be deemed reasonably necessary by the DIP Lender to effectuate the terms and conditions of the DIP Facility or this Order. The Debtors and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Facility, any amendments, waivers or modifications to the DIP Facility that are not materially adverse to the Debtors without further order of this Court; provided, however, that counsel to Debtors' secured creditors, the U.S. Trustee and any committee shall receive reasonable advance notice of any such modifications or amendments. Any other amendments or modifications require the prior approval of this Court upon notice and hearing.

15.    The Debtors are hereby required to afford representatives, agents, and/or employees of the DIP Lender access to the Debtors' premises, books, records and personnel (including officers and directors) in accordance with the Term Sheet, and shall cooperate, consult with, and provide to such persons all such information.

16.    Having been found to be extending credit to the Debtors in good faith, based on the record before this Court, the DIP Lender shall be entitled

{00080253.DOCX 6 }
19-42510-pjs    Doc 16    Filed 02/25/19    Entered 02/25/19 17:34:59    Page 44 of 78

to the full protection of section 364(e) of the Bankruptcy Code with respect to the Obligations and the DIP Facility Liens created, adjudicated, or authorized by this Order in the event that this Order or any finding, adjudication, or authorization contained herein is stayed, vacated, reversed, or modified on appeal. Any stay, modification, reversal, or vacation of this Order shall not affect the validity of any Obligations of the Debtors to the DIP Lender incurred by the Debtors pursuant hereto prior to the DIP Lender's actual receipt of written notice of the effective date of any such stay, modification, reversal, or vacation. Notwithstanding any such stay, modification, reversal, or vacation, all financing extended to the Debtors pursuant to this Order and all Obligations incurred by the Debtors pursuant hereto prior to the DIP Lender's actual receipt of written notice of the effective date of any such stay, modification, reversal, or vacation shall be governed in all respects by the original provisions hereof, and the DIP Lender shall be entitled to all the rights, privileges, and benefits, including, without limitation, the liens, security interests, and priorities granted herein with respect to all such Obligations.

17. The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order (a) confirming any plan of reorganization in the Cases, (b) converting the Cases to chapter 7 cases; or (c) dismissing the Cases, and, in each case, to the greatest extent permitted

by applicable law, the terms and provisions of this Order, as well as the Superpriority Claims and DIP Facility Liens granted pursuant to this Order, the Term Sheet, and related documents (as applicable) shall continue in full force and effect notwithstanding the entry of any such order, and such Superpriority Claims and DIP Facility Liens shall maintain their priority as provided by this Order until all of the Obligations are indefeasibly paid in full in cash.

18.     The DIP Lender is hereby relieved of the requirement to file proofs of claim or requests for payment of administrative expenses in the Cases with respect to any Obligations.

19.     Nothing in this Order, the DIP Facility, or any other documents related to these transactions shall in any way be construed or interpreted to impose or allow the imposition upon the DIP Lender of any liability for any claims arising from the prepetition or postpetition activities of the Debtors in the operation of their businesses, or in connection with their restructuring efforts.  The DIP Lender, shall not be deemed to be in control of the operations of the Debtors or to be acting as a "responsible persons" or "owners or operators" and shall have no fiduciary duty with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response,

Compensation and Liability Act, 29 U.S.C. §§ 9601 <u>et</u> <u>seq</u>. as amended, or any similar federal or state statute).

20.    Without prejudice to the rights of any other party, including any committee, the Debtors waive any and all claims and causes of action against the DIP Lender, and its agents, affiliates, subsidiaries, directors, officers, employees, representatives, attorneys, professionals and advisors, related to the DIP Facility, this Order or the negotiation of the terms thereof, other than the Debtors' right to enforce this Order and the Term Sheet.

21.    The stay of this Order set forth in Bankruptcy Rule 6004 is hereby waived and this Order shall be effective immediately upon its entry.

22.    To the fullest extent permitted by law, the provisions of this Order and the Term Sheet shall be binding upon and inure to the benefit of the parties thereto, and their respective successors and assigns.

23.    This Order, the Motion, and the Term Sheet shall be construed together when possible.  To the extent any provision of this Order directly conflicts with any provision of the Motion or any provision of the Term Sheet, the provisions of this Order shall control.

24.    The Final Hearing to consider the relief requested in the Motion is scheduled for March ___, 2019 at ___:___ __.m. (prevailing Eastern Time) before this Court.

25.    Within two business days after the entry of this Order, the Debtors shall serve, by United States Mail, first-class postage prepaid, notice of the entry of this Order and of the Final Hearing (the "Final Hearing Notice"), together with copies of this Order, the proposed Final Order and the Motion, on: (a) the Notice Parties; (b) any additional party which has filed prior to such date a request for notices with this Court and (c) counsel for any committee. The Final Hearing Notice shall state that any party in interest objecting to the relief sought at the Final Hearing shall file written objections with the Clerk of the United States Bankruptcy Court for the Eastern District of Michigan, no later than on March ___, 2019 at 4:00 p.m. (prevailing Eastern Time), which objections shall be served upon so as to be received on or before such date and time by: (A) Scott Wolfson, Wolfson Bolton PLLC, 3150 Livernois, Ste. 275, Troy, MI 48033, counsel for Debtors; (A) Thomas Radom, Butzel Long, Stoneridge West, 41000 Woodward Ave., Bloomfield Hills, MI 48304, counsel for DIP Lender; (C) Office of the United States Trustee; and (D) _____.

26.    This Court shall retain jurisdiction to enforce this Order, and over any matters or disputes arising from or relating to the implementation of this Order.

Exhibit 2

# DIP Facility Term Sheet

Borrowers (as defined below) have requested that the DIP Lender (as defined below) provide them with debtor-in-possession financing to cover cash shortfalls Borrowers and Guarantors (collectively, the "Debtors") are projected to experience in the payment of their operating costs and expenses of administration in their chapter 11 bankruptcy cases pending bankruptcy court approval of a sale of the Debtors' business assets pursuant to section 363 of the Bankruptcy Code (the "§363 Sale"). In consideration of the foregoing and the mutual agreements contained herein (the receipt and sufficiency of which are hereby acknowledged), the parties agree to, and be bound by, the following:

| | |
|---|---|
| **DIP Borrowers:** | Body Contour Ventures, LLC, BCA Acquisitions, LLC and American Aesthetic Equipment, LLC (jointly, the "Borrowers"), each of which is a Michigan Limited Liability Company. |
| **DIP Lender:** | RVB Investment Group, LLC, a Michigan Limited Liability Company ("DIP Lender"). |
| **DIP Guarantors:** | All debtor subsidiary operating entities ("Guarantors") identified in Exhibit A hereto. |
| **Purpose/Use of Proceeds:** | To pay operating costs and expenses of administration of the Debtors in accordance with the budget (the "Budget") attached hereto as Exhibit B or as otherwise expressly authorized in writing by the DIP Lender, for the period commencing as of the date of commencement ("Petition Date") of these chapter 11 cases (collectively, the "Bankruptcy Case"), in the United States Bankruptcy Court for the Eastern District of Michigan, Southern Division (the "Bankruptcy Court"), and ending upon the Maturity Date (as defined below). |
| **Maximum Amount:** | The maximum amount available under this credit facility (the "DIP Facility") at any one time outstanding shall be $1,700,000.00 (the "Maximum Amount"). The DIP Lender shall have no obligation to fund any amounts in excess of the Maximum Amount. |
| **Interim Financing:** | Prior to entry of a final non-appealable order (the "Final Order") approving the DIP Facility, the DIP Lender will provide up to $1,170,000.00 in interim financing subject to the entry of an order of the Bankruptcy Court approving the same ("Interim Order"); provided that, DIP Lender has advanced $170,000 to Borrowers pre-petition to cover the chapter 11 petition filing fees, critical payroll, and professional fees to secure retention of Debtors' professionals, and will initiate a wire of $50,000 to Wolfson Bolton PLLC and $55,000 to Conway MacKenzie, Inc. per |

the wire instructions provided by both professionals within 24 hours after the filing of the chapter 11 petitions to cover their respective first week of professional fee amounts provided for under the Budget, before the entry of the Interim Order (first week's professional fees to be held by the professionals in accordance with the terms of this Term Sheet), which advances shall be treated as funds advanced under the Interim Order; provided, further, that if, for any reason, the Interim Order fails to be entered in accordance with this Term Sheet, thus triggering an Event of Default, the professionals will promptly remit to DIP Lender the first week's professional fee advance net of reasonable necessary fees for services rendered prior to receipt of written notice of the Event of Default from DIP Lender. In no event shall the first week's professional fee advance be deemed property of the Debtors' estates if the Interim Order fails to be entered. The Interim and Final Orders shall be in form and substance reasonably acceptable to the DIP Lender, consistent with the terms hereof and containing such other terms and provisions as shall adequately protect the interests and claims of DIP Lender.

**Draws:**    Draws under the DIP Facility shall be on an as-needed basis in accordance with the Budget. Draw requests shall be made by Borrowers in writing in a form acceptable to the DIP Lender and must be received by 1:00 p.m. one business day prior to the business day an advance is requested.

**Maturity Date:**    The earlier of (i) May 24, 2019, (ii) the occurrence of an Event of Default (as defined below); or (iii) the closing of a § 363 Sale pursuant to an order authorizing a sale of substantially all of the Debtors' assets (the "Maturity Date"), The Maturity Date may only be extended with the written consent of the DIP Lender in its sole discretion. The DIP Lender shall have no further obligation to provide financing on or after the Maturity Date.

The commitment in respect of the DIP Facility shall expire on the Maturity Date and all amounts outstanding under the DIP Facility, including, without limitation, interest, fees and expenses chargeable to the DIP Facility as provided hereunder (collectively, the "Obligations") shall be repaid in full no later than the Maturity Date without the DIP Lender being required to make demand upon Borrowers or Guarantors or to give notice that the DIP Facility has expired and the Obligations are due and payable.

Any confirmation order entered in connection with a liquidation or reorganization plan shall not discharge or

otherwise affect in any way any of the Obligations of Borrowers and Guarantors to the DIP Lender under the DIP Facility or the Borrowers' or Guarantors' obligations to the DIP Lender under the Interim Order or the Final Order, other than after payment in full in cash to the DIP Lender of all Obligations under the DIP Facility on or before the effective date of any such plan.

**Interest Rate:** Interest on the DIP Facility shall accrue at the rate of 12% per annum on the outstanding day-to-day principal balance. Upon the occurrence and during the continuance of any Event of Default, the Borrowers' Obligations under the DIP Facility will accrue interest at a rate of 2.0% per annum above the otherwise applicable interest rate. Interest shall be calculated daily for fee actual number of days elapsed in the period during which it accrues based on a year of 365/366 days, as applicable.

**Payments:** All outstanding principal, interest, fees and expenses chargeable to the DIP Facility shall be due and payable on the Maturity Date.

**Fees and Expenses:** All reasonable professional fees and expenses incurred by the DIP Lender in connection with the DIP Facility shall be chargeable to and become part of Borrowers' Obligations to the DIP Lender under the DIP Facility.

**DIP Security and Claims:** All Obligations of Borrowers and Guarantors to the DIP Lender shall be secured by valid, perfected and enforceable liens and security interests (the "DIP Facility Liens") in all pre- and post-petition property of the Debtors, other than avoidance causes of actions arising on or after the Petition Date under the provisions of chapter 5 of the Bankruptcy Code and subject to the Carve-Out (defined below), with the following priorities: (a) pursuant to section 364(c)(2) of the Bankruptcy Code, a first priority, perfected lien and security interest upon all of the Debtors' property that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date, and (b) pursuant to section 364(c)(3), best available junior, perfected liens and security interests upon all of the Debtors' property that is subject to valid, binding, enforceable and perfected liens of the secured claims that existed as of the Petition Date.

All Obligations to the DIP Lenders shall enjoy super-priority administrative expense status under 11 USC §364(c)(l) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other

provisions of the Bankruptcy Code ("Super-priority Claim"), subject only to the Carve-Out (defined below).

The DIP Facility Liens and priorities provided to the DIP Lender shall be subject to a carve-out (the "Carve-Out") for the payment of (1) Court-allowed and unpaid professional fees, expenses, and disbursements in amounts not to exceed the line items allocated to each professional under the Budget (in the aggregate, the "Professional Expense Cap"), and (2) the payment of fees pursuant to 28 U.S.C. § 1930 ("UST Fees"); provided, that so long as neither the Maturity Date nor an Event of Default (defined below) that results in a termination of the DIP Facility has occurred, (i) Borrowers will fund each professional's weekly allocated amount under the Budget in advance, which each professional will hold in trust for application to the professional's invoices when allowed by the Court, and Borrowers will be permitted to pay allowed UST Fees as the same are due and payable in an amount not to exceed those set forth in the Budget; and (ii) payments of professional fees and UST Fees shall not reduce the amount of the Carve-Out. During the continuance of an Event of Default (defined below) under this Term Sheet or a default under the Interim Order or the Final Order, as the case may be, any payments actually made to such professionals during such continuance shall reduce the Professional Expense Cap on a dollar-for-dollar basis.

**Guaranty**:

Guarantors unconditionally and irrevocably guarantee to DIP Lender the prompt payment, when due or declared due, all indebtedness and liabilities of Borrowers to DIP Lender under the Term Sheet. The obligation of Guarantors shall be unconditional and absolute without any defense, setoff or counterclaim which Guarantors may assert.

**Representations and Warranties:**

Borrowers and Guarantors represent and warrant to the DIP Lender, upon which the DIP Lender relies in entering into this Term Sheet and providing the DIP Facility, that the transactions contemplated by this Term Sheet:

(i) upon the entry of the DIP Order, constitute legal, valid and binding obligations of the Borrowers, enforceable in accordance with their terms; and

(ii) upon the entry of the DIP Order, do not require the consent or approval of, registration or filing with, or any other action by, any governmental authority; and

(iii) will not violate any other post-Petition Date agreement.

**Affirmative Covenants**: Borrowers and Guarantors covenant and agree to do the following:

(i) Allow DIP Lender and its advisors full access to the Borrowers' and Guarantors' books, records and personnel (including, directors and officers and advisors) and cause management to reasonably cooperate with the DIP Lender and its advisors;

(ii) Keep the DIP Lender and its advisors apprised on a timely basis of all material developments with respect to the business and affairs of Borrowers and Guarantors;

(iii) Use the proceeds of the DIP Facility only for the purposes of the short-term liquidity needs of the Debtors, consistent with the restrictions set out herein and the Budget;

(iv) Operate the Debtors' businesses in the ordinary course of business;

(v) Preserve, renew and keep in full force each Debtor's corporate existence and material licenses;

(vi) Forthwith (and in no event later than 24 hours after obtaining knowledge of such event) notify in writing the DIP Lender and its attorneys of the occurrence of any default or Event of Default, or of any event or circumstance that may constitute a material adverse change to the Borrowers' business;

(vii) Maintain at all times acceptable general liability, professional liability, property and workers compensation insurance coverage of such type, in such amounts and against such risks as is prudent for a business of an established reputation with financially sound and reputable insurers in coverage and scope acceptable to the DIP Lender;

(viii) Pay all taxes and other post-petition obligations as and when due except where contested in good faith and by appropriate proceedings; and

(ix) Comply in all material respects with all applicable laws, rules and regulations applicable to their businesses, including, without limitation, environmental health care laws.

**Negative Covenants:**   Borrowers and Guarantors covenant and agree not to do the following other than with the prior written consent of the DIP Lender:

(i)      Create or permit to exist indebtedness for borrowed money post-Petition Date other than debt contemplated by this DIP Facility, without the DIP Lender's consent;

(ii)      Make any payments outside the ordinary course of business, or inconsistent with the Budget, or the DIP Facility, including, without limitation, payments of bonuses of any kind to any manager, directors, officers or employees of the Debtors; provided, however, that (a) there shall be an allowed variance of 15% of cumulative disbursements during the first 4 weeks of the Budget and an allowed variance of 10% of cumulative disbursements during the final 9 weeks of the Budget; but (b) in no event shall any such variances be deemed to increase, or constitute grounds to increase, the Maximum Amount;

(iii)      Other than adequate protection replacement liens for any validly perfected pre-petition secured creditors, permit any new liens to exist on any of the Debtors' properties or assets other than liens in favor of the DIP Lender or statutory liens; and

(iv)      Other than the Carve-Out, permit to exist any other administrative claim which is senior to or *pari passu* with the superpriority claims of the DIP Lender.

**Financial Reporting:**   Borrowers will provide, at the reasonable request of the DIP Lender:

(i)      Weekly reports of cash receipts and cash disbursements as compared to the Budget;

(ii)      Immediately, copies of all reports provided to any other secured creditor of the Debtors;

(iii)      Immediately, reports filed by the Debtors or provided to the Office of the U.S. Trustee; and

(iv)      All other reports, documents, and information that the DIP Lender may reasonably request.

**Events of Default:**   The occurrence of any one or more of the following events shall constitute an event of default ("**Event of Default**") unless otherwise waived in writing by the DIP Lender:

(i)     Borrowers materially breach any of the terms and conditions or covenants of this Term Sheet, or fail to pay the Obligations, including, but not limited to, principal, interest and fees when due;

(ii)     Actual cumulative sales generated for the first 4 weeks from the Petition Date are, in the sole reasonable opinion of DIP Lender, materially less than the same period cumulative sales projected in the Budget;

(iii)     The appointment of a receiver, chapter 11 trustee, interim receiver, examiner with enlarged powers, or similar official, other than at the direction or with the support of the DIP Lender, or the chapter 11 case is converted to a case under chapter 7 of the Bankruptcy Code;

(iv)     Except for the Carve-Out and as otherwise expressly provided by this Term Sheet, the entry of an order granting any other claim superpriority status or a lien equal or superior to that granted to the DIP Lender pursuant to the DIP Order;

(v)     The date of entry of an order amending, supplementing, staying, vacating or otherwise modifying the DIP Facility or this Term Sheet without the consent of the DIP Lender;

(vi)     The date of any attempt by any party to invalidate, reduce or otherwise impair the DIP Lender's post-petition liens and claims;

(vii)     The filing by Borrowers (or with the consent or support of Borrowers) of any reorganization or liquidation plan that is not sponsored by the DIP Lender or is inconsistent with this Term Sheet (the "**Reorganization Plan**");

(viii)     Confirmation of a Reorganization Plan on terms which alter the terms of this Term Sheet in any matter not acceptable to the DIP Lender, in its sole discretion;

(ix)     The Debtors cease or threaten to cease to carry on business in the ordinary course, except where such cessation occurs in connection with a sale of all or substantially all of

the assets of the Debtors or other restructuring or reorganization of the Debtors which has been consented to by the DIP Lender;

(x)      Any representation or warranty by Borrowers shall be incorrect or misleading in any material respect when made;

(xi)      Borrowings under the DIP Facility exceed the Maximum Amount;

(xii)      the failure of Borrowers to file a motion to sell substantially all of the Debtors' assets to DIP Lender or its designee pursuant to § 363 of the Bankruptcy Code ("**363 Sale**") and to established sale procedures within 5 days of the Petition Date;

(xiii)      the failure of Borrowers to obtain entry of an order establishing the sale procedures ("**Sales Procedures Order**") for the 363 Sale of substantially all of the Debtors' assets, in form reasonably acceptable to DIP Lender, within 10 days of the Petition Date;

(xiv)      the failure of Borrowers to obtain entry of a final, non-appealable order approving the sale of substantially all of the Debtors' assets ("**Sale Order**") to DIP Lender, subject to any higher and better bid of the third party, within 80 days of the Petition Date; or

(xv)      the failure of Borrowers to close on the 363 Sale of substantially all of the Debtors' assets to DIP Lender or any third party that submitted the highest and best bid by May 24, 2019.

Upon the occurrence of an Event of Default, the DIP Lender may, at its option, terminate the DIP Facility and declare all amounts outstanding immediately due and payable.

**Reorganization Plan:**      With respect to a Reorganization Plan, this Term Sheet is not intended to and shall not create any binding obligations on the part of the DIP Lender until the parties have executed definitive documents with respect to a Reorganization Plan.

**Conditions Precedent to Initial Funding:**      (A)      Borrowers and the DIP Lender shall agree on the Budget, in a form satisfactory to the DIP Lender, for the period ending on the Maturity Date.

(B)     The Court shall have entered the Interim Order in form and substance satisfactory to the DIP Lender in its sole discretion, within 3 business days of the Petition Date and which order shall, without limitation, include:

(i)     provisions approving this Term Sheet and the DIP Facility created herein and the execution and delivery by Borrowers of such other documents as the DIP Lender deems necessary or appropriate, acting reasonably;

(ii)     provisions granting to the DIP Lender the DIP Facility Liens and Super-priority Claim;

(iii)     provisions authorizing the DIP Lender to effect registrations, filings and recordings wherever in its discretion they deem appropriate regarding the DIP Facility Liens;

(iv)     provisions confirming that the DIP Facility Liens shall have the priority set out above;

(v)     provisions providing that the DIP Facility Liens shall be valid and effective to secure all of the Obligations of Borrowers to the DIP Lender without the necessity of the making of any registrations or filings and whether or not any other documents are executed by Borrowers and the DIP Lender pursuant hereto;

(vi)     provisions declaring that the granting of the DIP Facility Liens and all other documents executed and delivered to the DIP Lender as contemplated herein, including, without limitation, all actions taken to perfect, record and register the DIP Facility Liens, do not constitute conduct meriting an oppression remedy, settlements, fraudulent preferences, fraudulent conveyances or other challengeable or reviewable transactions under any applicable federal or state law;

(vii)     provisions restricting the granting of any additional liens or encumbrances on the assets of the Debtors other than as permitted herein; and

(viii)     provisions providing the DIP Lender and its advisors clear and unfettered access to the books, records and

personnel (including directors and officers) of the Debtors and such other information as the DIP Lender and its advisors deem necessary or desirable;

(C)     The representations and warranties of the Borrowers in the Term Sheet shall be true and correct, in all material respects; and

(D)     The DIP Lender shall be satisfied that: (i) Borrowers have complied with and are continuing to comply in all material respects with all applicable laws, regulations and policies in relation to their businesses; and (ii) there are no liens ranking ahead of the DIP Facility Liens, except as provided for herein (including the Carve-Out) or as arising by operation of law in the ordinary course of business without any contractual grant of security.

**Indemnity:**

Borrowers and Guarantors shall indemnify and hold harmless the DIP Lender and officers, directors, fiduciaries, employees, agents, advisor, attorneys, and representatives from and against all losses, claims, liabilities, damages, and expenses (including, without limitation, fees and disbursements of counsel) in connection with any investigation, litigation, or proceeding, or the preparation of any defense with respect thereto, arising out of or relating to the DIP Facility or the transactions contemplated in this Term Sheet, other than for the DIP Lender's own gross negligence or willful misconduct.

**Credit Bid:**

The DIP Lender has the right to offset all or any portion of the outstanding Obligations under the DIP Facility in any sale of the Debtors' assets or consideration to be provided by DIP Lender under any Reorganization Plan.

**Notice:**

Any notice or other instrument to be given hereunder must be in writing and, except as otherwise provided in this Agreement, will be deemed to be duly given (i) if mailed, three (3) days following the date of mailing, or (ii) if sent by electronic mail with a pdf attachment, facsimile or hand delivered, on the day on which it was so delivered. Until changed by notice in the manner described above, the addresses of the Parties for the purpose of notice will be:

If to Borrowers and Guarantors:

Body Contour Ventures, LLC
34405 W. 12 Mile Rd., Ste. 200
Farmington Hills, MI 48331
Attn:   Rich Morgan, President

|                     |                                       |
|---------------------|---------------------------------------|
|                     | Facsimile:                            |
|                     | Email: rich@lightrx.com               |
|                     |                                       |
| With a copy to:     | Wolfson Bolton PLLC                   |
|                     | 3150 Livernois, Ste. 275              |
|                     | Troy, MI 48033                        |
|                     | Attn:   Scott Wolfson                 |
|                     | Facsimile: (248) 247-7099             |
|                     | Email: swolfson@wolfsonbolton.com     |
|                     |                                       |
| If to DIP Lender:   | RVB Investment Group, LLC             |
|                     | 9760 Fellows Hill Court               |
|                     | Plymouth, MI 48170                    |
|                     | Attn:   Vincent Spica                 |
|                     | Facsimile:                            |
|                     | Email: vincent.spica@yahoo.com        |
|                     |                                       |
| With a copy to:     | Butzel Long                           |
|                     | Stoneridge West                       |
|                     | 41000 Woodward Ave.                   |
|                     | Bloomfield Hills, MI 48304            |
|                     | Attn:   Thomas B. Radom               |
|                     | Facsimile: (248) 258-1439             |
|                     | Email: radom@butzel.com               |

**Entire Agreement:** This Term Sheet together with the other documents described herein, constitutes the entire understanding of the parties in connection with the subject matter hereof. This Term Sheet may not be modified, altered or amended except by an agreement in writing signed by all parties.

**Governing Law**: To the extent not governed by the United States Bankruptcy Code, the DIP Facility shall be construed in accordance with the laws of the State of Michigan.

**DIP Order:** To the extent any provision of this Term Sheet conflicts with any provision of the Interim Order or the Final Order (each, a "DIP Order"), or terms are defined with more specificity in the Interim Order or the Final Order, the provisions of the Interim Order or the Final Order shall govern; provided, however, the form of Interim Order and Final Order must be in a form acceptable to the DIP Lender in its discretion.

**Counterparts:** This Term Sheet may be executed in counterparts and all such counterparts will constitute one agreement binding on all the parties, notwithstanding that the parties are not

signatories to the same counterpart. Signature pages to this Agreement may be signed and delivered by facsimile or .pdf format and any such signature will have the same force and effect as a manually signed original.

**Dated: February 22, 2019**

**[Signatures appear on next page]**

Signature Page to DIP Facility Term Sheet.

**DIP BORROWERS:**

BODY CONTOUR VENTURES, LLC

By: _____
Name: _____Richard Morgan_____
Title: _____Manager_____

BCA ACQUISITIONS, LLC

By: _____
Name: _____Richard Morgan_____
Title: _____President_____

AMERICAN AESTHETIC EQUIPMENT, LLC

By: _____
Name: _____Richard Morgan_____
Title: _____Manager_____

**GUARANTORS:**

KNOXVILLE LASER SPA LLC

By: _____
Name: _____Richard Morgan_____
Title: _____President_____

LRX ALEXANDRIA, LLC

By: _____
Name: _____Richard Morgan_____
Title: _____President_____

LRX BIRMINGHAM, LLC

By: _____
Name: _Richard Morgan_____
Title: _President_____

LRX CHARLOTTE, LLC

By: _____
Name: _Richard Morgan_____
Title: _President_____

LRX CHICAGO, LLC

By: _____
Name: _Richard Morgan_____
Title: _President_____

LRX COLORADO SPRINGS, LLC

By: _____
Name: _Richard Morgan_____
Title: _President_____

LRX DEARBORN, LLC

By: _____
Name: _Richard Morgan_____
Title: _President_____

LRX EAST LANSING, LLC

By: _____
Name: _Richard Morgan_____

Title: _President_

LRX GRAND BLANC, LLC

By: _____
Name: _Richard Morgan_
Title: _President_

LRX HOFFMAN ESTATES, LLC

By: _____
Name: _Richard Morgan_
Title: _President_

LRX LAS VEGAS SUMMERLIN, LLC

By: _____
Name: _Richard Morgan_
Title: _President_

LRX MESA, LLC

By: _____
Name: _Richard Morgan_
Title: _President_

LRX NAPERVILLE, LLC

By: _____
Name: _RICHARD MORGAN_
Title: _PRESIDENT_

LRX NOVI, LLC

By: _____
Name: _RICHARD MORGAN_

Title: *President*

**LRX ORLAND PARK, LLC**

By: _____

Name: *Richard Morgan*

Title: *President*


**LRX PLYMOUTH-CANTON, LLC**

By: _____

Name: *Richard Morgan*

Title: *President*


**LRX STONE OAK, LLC**

By: _____

Name: *Richard Morgan*

Title: *President*


**LRX TOWSON, LLC**

By: _____

Name: *Richard Morgan*

Title: *President*


**LRX TROY, LLC**

By: _____

Name: *Richard Morgan*

Title: *President*


**PREMIER LASER SPA OF GREENVILLE LLC**

By: _____

Name: *Richard Morgan*

Title: _President_

PREMIER LASER SPA OF INDIANAPOLIS LLC

By: _____
Name: _Richard Morgan_
Title: _President_

PREMIER LASER SPA OF LOUISVILLE LLC

By: _____
Name: _Richard Morgan_
Title: _President_

PREMIER LASER SPA OF PITTSBURGH LLC

By: _____
Name: _Richard Morgan_
Title: _President_

PREMIER LASER SPA OF ST. LOUIS LLC

By: _____
Name: _Richard Morgan_
Title: _President_

PREMIER LASER SPA OF VIRGINIA LLC

By: _____
Name: _Richard Morgan_
Title: _President_

**DIP LENDER:**

RVB INVESTMENT GROUP, LLC

By:
Name:   Vincent Setop
Title:   manage partner/member

**EXHIBIT A**

LIST OF GUARANTORS

Body Contour Ventures, LLC
BCA Acquisitions, LLC
American Aesthetic Equipment, LLC
Knoxville Laser Spa LLC
LRX Alexandria, LLC
LRX Birmingham, LLC
LRX Charlotte, LLC
LRX Chicago, LLC
LRX Colorado Springs, LLC
LRX Dearborn, LLC
LRX East Lansing, LLC
LRX Grand Blanc, LLC
LRX Hoffman Estates, LLC
LRX Las Vegas Summerlin, LLC
LRX Mesa, LLC
LRX Naperville, LLC
LRX Novi, LLC
LRX Orland Park, LLC
LRX Plymouth-Canton, LLC
LRX Stone Oak, LLC
LRX Towson, LLC
LRX Troy, LLC
Premier Laser Spa of Greenville LLC
Premier Laser Spa of Indianapolis LLC
Premier Laser Spa of Louisville LLC
Premier Laser Spa of Pittsburgh LLC
Premier Laser Spa of St. Louis LLC
Premier Laser Spa of Virginia LLC

**EXHIBIT B**

BUDGET

See attached.

Light Rx
Key Assumptions
13-Week DIP Cash Flow Projection
February 22, 2019

| Cash Flow Line Item | Assumption Explanation |
|---|---|
| Sales | Projected sales are based on actual client booking conversion rates from marketing spend experienced during 2017, factored for each store location, plus any upsales. The budget contemplates 26 stores going forward. Due to the headwinds expected post-petition, the projected sales include a discount factor between 50% and 80% during the period |
| Payroll | Corporate payroll is based on payroll by person (paid twice/month on 15th and 30th) |
| | Clinics based on payroll by location by person (paid twice/month on 7th and 22nd) for 26 store locations |
| | Medical directors (1099) are by location by person (paid once/month at end of month) |
| | Past due employee matters are included in week 2 for underfunded payroll for 2/8/19 and week 5 for underfunded payroll from 2/22/19 (clinic payroll) and week 10 for underfunded corporate payroll |
| Health and Workers Comp Insurance | BCBS (medical) paid once/month mid-month and is projected based market rate quotes |
| | Hartford (workers comp) quarterly payments (due 4/1, 7/1 & 10/1) of $5,000 |
| Property and Business/Professional Insurance | Property insurance is projected based on run-rate of current insurance provider costs, paid weekly. Professional and business insurance is projected to be paid monthly in the last week of the month. |
| Marketing | Using three channels -- search engine optimization, search engine marketing, and social media only with average weekly spend of $58,000 during the period |
| Rent | Based on actual lease agreements for the 26 stores going forward, plus one time eviction cures (Frisco for $11,265 and Stone Oak for $14,800) |
| Professional Fees | Refer to the Professional Fees supporting schedule |

**Light Rx**
**Weekly Cash Flow Forecast**
**USD**

| Week Ending: | Forecast Week 1 3/3/2019 | Forecast Week 2 3/10/2019 | Forecast Week 3 3/17/2019 | Forecast Week 4 3/24/2019 | Forecast Week 5 3/31/2019 | Forecast Week 6 4/7/2019 | Forecast Week 7 4/14/2019 | Forecast Week 8 4/21/2019 | Forecast Week 9 4/28/2019 | Forecast Week 10 5/5/2019 | Forecast Week 11 5/12/2019 | Forecast Week 12 5/19/2019 | Forecast Week 13 5/26/2019 | 13-Week FCST Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts:** | | | | | | | | | | | | | | |
| Sales, net | 80,496 | 180,123 | 220,626 | 247,124 | 253,961 | 311,597 | 345,747 | 365,158 | 369,461 | 419,032 | 433,896 | 448,718 | 453,163 | 4,129,102 |
| **Total Receipts** | 80,496 | 180,123 | 220,626 | 247,124 | 253,961 | 311,597 | 345,747 | 365,158 | 369,461 | 419,032 | 433,896 | 448,718 | 453,163 | 4,129,102 |
| **Operating Disbursements:** | | | | | | | | | | | | | | |
| Payroll | (95,167) | (174,800) | (55,444) | (174,800) | (83,450) | (174,800) | (55,444) | (174,800) | (43,653) | (74,194) | (174,800) | (55,444) | (259,965) | (1,596,759) |
| Health and Workers Comp Insurance | | | (40,000) | | | (5,000) | (40,000) | | | | (40,000) | | | (125,000) |
| Trade Vendors | (77,140) | (26,000) | (11,400) | (16,494) | (16,494) | (27,088) | (22,784) | (22,894) | (22,894) | (33,425) | (27,085) | (27,202) | (27,202) | (358,101) |
| Marketing | (21,000) | (59,125) | (59,125) | (63,500) | (63,500) | (59,125) | (59,125) | (63,500) | (63,500) | (59,125) | (59,125) | (63,500) | (63,500) | (756,750) |
| Equipment Leases | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (306,236) |
| Property and Business Insurance | (1,700) | (1,700) | (1,700) | (49,200) | (1,700) | (1,700) | (1,700) | (1,700) | (17,533) | (1,700) | (1,700) | (1,700) | (1,700) | (85,433) |
| Rent | (125,486) | | | | | (125,486) | | | | | (125,486) | | | (376,457) |
| Utilities | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (49,820) |
| Travel and Other Expenses | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (130,000) |
| **Total Disbursements** | (357,882) | (299,013) | (205,058) | (341,382) | (202,532) | (430,587) | (216,442) | (300,283) | (184,969) | (205,833) | (465,584) | (185,235) | (389,755) | (3,784,556) |
| **Operating Cash Flow** | (277,386) | (118,890) | 15,568 | (94,258) | 51,429 | (118,990) | 129,305 | 64,875 | 184,492 | 213,199 | (31,688) | 263,484 | 63,407 | 344,547 |
| **Non-Operating Cash Flows:** | | | | | | | | | | | | | | |
| Professional Fees | (112,500) | (82,500) | (67,500) | (92,500) | (78,745) | (72,500) | (62,500) | (87,500) | (77,359) | (72,500) | (67,500) | (87,500) | (76,967) | (1,038,071) |
| Past Due Employee Pay Matters | | (85,218) | | | (111,621) | | | | | (289,417) | | | | (486,256) |
| Insurance Reinstatements (Med, other) | (26,425) | | | | | | | | | | | | | (26,425) |
| Rent Eviction Cures | | | | | | | | | | | | | | |
| Utility Deposits | | (4,500) | (4,500) | (4,500) | (4,500) | | | | | | | | | (18,000) |
| Equipment Marshalling (Closed Locations) | | | (15,000) | | | | | | | | | | | (15,000) |
| **Total Non-Operating Cash Flows** | (138,925) | (172,218) | (87,000) | (97,000) | (194,866) | (72,500) | (62,500) | (87,500) | (77,359) | (361,917) | (67,500) | (87,500) | (76,967) | (1,583,751) |
| **Net Cash Flow** | $ (416,311) | (291,108) | (71,432) | (191,258) | (143,437) | (191,490) | 66,805 | (22,625) | 107,133 | (148,718) | (99,188) | 175,984 | (13,559) | $ (1,239,204) |
| **Cash Balance (Book)** | | | | | | | | | | | | | | |
| Beginning Balance | $ – | 33,689 | 42,581 | 21,149 | 29,891 | 36,454 | 44,964 | 111,769 | 89,144 | 196,277 | 47,559 | 23,371 | 199,355 | $ – |
| Net Cash Flow | (416,311) | (291,108) | (71,432) | (191,258) | (143,437) | (191,490) | 66,805 | (22,625) | 107,133 | (148,718) | (99,188) | 175,984 | (13,559) | (1,239,204) |
| Additions from DIP Funding | 450,000 | 300,000 | 50,000 | 200,000 | 150,000 | 200,000 | | | | | 75,000 | | | 1,425,000 |
| Paydown of DIP | | | | | | | | | | | | | | |
| **Ending Balance** | $ 33,689 | 42,581 | 21,149 | 29,891 | 36,454 | 44,964 | 111,769 | 89,144 | 196,277 | 47,559 | 23,371 | 199,355 | 185,796 | $ 185,796 |
| **DIP Account Balance** | | | | | | | | | | | | | | |
| Beginning Balance | $ 170,000 | 620,000 | 920,000 | 970,000 | 1,170,000 | 1,320,000 | 1,520,000 | 1,520,000 | 1,520,000 | 1,520,000 | 1,520,000 | 1,595,000 | 1,595,000 | $ 170,000 |
| Borrowings | 450,000 | 300,000 | 50,000 | 200,000 | 150,000 | 200,000 | | | | | 75,000 | | | 1,425,000 |
| Paydowns | | | | | | | | | | | | | | |
| **Ending Balance** | $ 620,000 | 920,000 | 970,000 | 1,170,000 | 1,320,000 | 1,520,000 | 1,520,000 | 1,520,000 | 1,520,000 | 1,520,000 | 1,595,000 | 1,595,000 | 1,595,000 | $ 1,595,000 |

**Light Rx**
**Professional Fees Schedule**
**13-Week DIP Cash Flow Projection**

| Professional Firm | | Forecast Week 1 3/3/2019 | Forecast Week 2 3/10/2019 | Forecast Week 3 3/17/2019 | Forecast Week 4 3/24/2019 | Forecast Week 5 3/31/2019 | Forecast Week 6 4/7/2019 | Forecast Week 7 4/14/2019 | Forecast Week 8 4/21/2019 | Forecast Week 9 4/28/2019 | Forecast Week 10 5/5/2019 | Forecast Week 11 5/12/2019 | Forecast Week 12 5/19/2019 | Forecast Week 13 5/26/2019 | 13-Week FCST Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wolfson Bolton | Debtor's Counsel | 50,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 350,000 |
| Conway MacKenzie | Debtor's FA | 55,000 | 45,000 | 35,000 | 35,000 | 35,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 35,000 | 30,000 | 30,000 | 450,000 |
| Dixon MacDonald | Debtor's Business Counsel | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| Beutzel Long | DIP Counsel | - | - | - | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 | - | 75,000 |
| TBD | UCC Counsel | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| PS Trustee | (1% of disb.) | - | - | - | - | 11,245 | - | - | - | 14,859 | - | - | - | 14,467 | 40,571 |
| TBD | Claims Agent | 5,000 | 5,000 | - | - | - | 10,000 | - | - | - | 10,000 | - | - | - | 30,000 |
| Total Professional Fees | | 112,500 | 82,500 | 67,500 | 92,500 | 78,745 | 72,500 | 62,500 | 87,500 | 77,359 | 72,500 | 67,500 | 87,500 | 76,967 | 1,038,071 |
| Memo: US Trustee Fee Accrual | | | | | | | | | | | | | | | |
| Beginning Balance | | - | 4,704 | 8,519 | 11,245 | 15,583 | 7,039 | 12,070 | 14,859 | 18,737 | 6,353 | 9,136 | 14,467 | 17,194 | - |
| Incurred (pct. of disb) | 1.0% | 4,704 | 3,815 | 2,726 | 4,339 | 2,700 | 5,031 | 2,789 | 3,878 | 2,475 | 2,783 | 5,331 | 2,727 | 625 | 43,923 |
| Paid | | - | - | - | - | (11,245) | - | - | - | (14,859) | - | - | - | (14,467) | (40,571) |
| Ending Balance | | 4,704 | 8,519 | 11,245 | 15,583 | 7,039 | 12,070 | 14,859 | 18,737 | 6,353 | 9,136 | 14,467 | 17,194 | 3,352 | 3,352 |

Exhibit 3

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| Body Contour Ventures, LLC, | Case No. 19-42510-pjs |
| Debtor. | Hon. Phillip J. Shefferly |

**DECLARATION OF CARL J. SEKELY**
**IN SUPPORT OF DEBTOR-IN-POSSESSION FINANCING**

I, Carl J. Sekely, declare:

1.      I am a Managing Director of Conway MacKenzie, Inc. ("CM").

2.      Unless otherwise stated, this Declaration is based upon my personal knowledge, review of Debtors' books and records, and information gathered from Debtors' management.[1]

3.      Debtors retained CM as their financial advisor on January 18, 2019.

4.      CM has become familiar with the financial condition of Debtors, their operations, and their cash flows.

5.      Debtors' use of its remaining cash, which is unencumbered, would be insufficient to enable Debtors to operate beyond this week.

---

[1] Capitalized terms used but not otherwise defined have the meanings given to them in the *Emergency Motion for Interim and Final Orders Authorizing Debtors to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis and Scheduling a Final Hearing* ("Motion").

6.      At Debtors' request, a 13-week, weekly cash forecast was prepared that begins with this week, the week ending March 3, 2019 ("Budget").  The Budget is attached as Exhibit A to this Declaration.

7.      The Budget assumes no new debt (other than the incurrence of trade debt in the ordinary course and the DIP Facility) or equity financing, capital or other liquidity infusion (other than the collection of accounts in the ordinary course), and that Debtors have unrestricted access to 100% of their existing cash and future cash collections during the period covered by the Budget.

8.      The Budget demonstrates that without additional borrowings or capital infusion, Debtors will have insufficient cash collections and, therefore, insufficient cash to operate their businesses beyond this week, the week ending March 3, 2019, and as a result could not conduct a sale process and otherwise maximize going concern value under§ 363.

9.      Debtors would not be able to sustain their business operations solely with the use of cash and require additional liquidity to finance their current operations in the form of the § 364 financing requested in the Motion.

10.      While Debtors have spoken to other potential lenders for debtor-in-possession financing, the only party that is willing to make debtor-

in-possession financing available on terms that Debtors reasonably believe can be satisfied is the DIP Lender.

11.     Debtors courted their last expected combined source of debtor-in-possession financing and stalking horse, an unrelated/non-insider third party, for several months, only to have the expected financing source opt not to lend at beyond the eleventh hour in late January, 2019.

12.     It would be time consuming, expensive, and ultimately futile for Debtors to further attempt to obtain approval for financing with a lender other than the DIP Lender.  Debtors are unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under § 503(b)(1) of the Bankruptcy Code, as an administrative expense under §§ 364(a) or 364(b) of the Bankruptcy Code, or on terms otherwise more favorable than those terms offered by the DIP Lender.

13.     Debtors must have the interim relief requested in the Interim Order to maintain and operate their businesses.  Absent such relief, Debtors will be unable to meet their payroll obligations or to preserve and protect their assets and the value of those assets, and operations will cease.

14.    I declare under penalty of perjury that the foregoing is true and correct.


Dated: February 25, 2019                    /s/ Carl J. Sekely
                                            Carl J. Sekely
Executed in Oakland County, Michigan

Light Rx
Key Assumptions
13-Week DIP Cash Flow Projection
February 22, 2019

| Cash Flow Line Item | Assumption Explanation |
|---|---|
| Sales | Projected sales are based on actual client booking conversion rates from marketing spend experienced during 2017, factored for each store location, plus any upsales. The budget contemplates 26 stores going forward. Due to the headwinds expected post-petition, the projected sales include a discount factor between 50% and 80% during the period |
| Payroll | Corporate payroll is based on payroll by person (paid twice/month on 15th and 30th)<br>Clinics based on payroll by location by person (paid twice/month on 7th and 22nd) for 26 store locations<br>Medical directors (1099) are by location by person (paid once/month at end of month)<br>Past due employee matters are included in week 2 for underfunded payroll for 2/8/19 and week 5 for underfunded payroll from 2/22/19 (clinic payroll) and week 10 for underfunded corporate payroll |
| Health and Workers Comp Insurance | BCBS (medical) paid once/month mid-month and is projected based market rate quotes<br>Hartford (workers comp) quarterly payments (due 4/1, 7/1 & 10/1) of $5,000 |
| Property and Business/Professional Insurance | Property insurance is projected based on run-rate of current insurance provider costs, paid weekly. Professional and business insurance is projected to be paid monthly in the last week of the month. |
| Marketing | Using three channels -- search engine optimization, search engine marketing, and social media only with average weekly spend of $58,000 during the period |
| Rent | Based on actual lease agreements for the 26 stores going forward, plus one time eviction cures (Frisco for $11,265 and Stone Oak for $14,800) |
| Professional Fees | Refer to the Professional Fees supporting schedule |

**Light Rx**
**Weekly Cash Flow Forecast**
USD

| Week Ending: | Forecast Week 1 3/3/2019 | Forecast Week 2 3/10/2019 | Forecast Week 3 3/17/2019 | Forecast Week 4 3/24/2019 | Forecast Week 5 3/31/2019 | Forecast Week 6 4/7/2019 | Forecast Week 7 4/14/2019 | Forecast Week 8 4/21/2019 | Forecast Week 9 4/28/2019 | Forecast Week 10 5/5/2019 | Forecast Week 11 5/12/2019 | Forecast Week 12 5/19/2019 | Forecast Week 13 5/26/2019 | 13-Week FCST Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Operating Receipts:** | | | | | | | | | | | | | | |
| Sales, net | 80,496 | 180,123 | 220,626 | 247,124 | 253,961 | 311,597 | 345,747 | 365,158 | 369,461 | 419,032 | 433,896 | 448,718 | 453,163 | 4,129,102 |
| Total Receipts | 80,496 | 180,123 | 220,626 | 247,124 | 253,961 | 311,597 | 345,747 | 365,158 | 369,461 | 419,032 | 433,896 | 448,718 | 453,163 | 4,129,102 |
| **Operating Disbursements:** | | | | | | | | | | | | | | |
| Payroll | (95,167) | (174,800) | (55,444) | (174,800) | (83,450) | (174,800) | (55,444) | (174,800) | (43,653) | (74,194) | (174,800) | (55,444) | (259,965) | (1,596,759) |
| Health and Workers Comp Insurance | (77,140) | (26,000) | (40,000) | (11,400) | — | (5,000) | (40,000) | — | — | (33,425) | (40,000) | — | (27,202) | (125,000) |
| Trade Vendors | (21,000) | (59,125) | (59,125) | (16,494) | (63,500) | (59,125) | (22,894) | (63,500) | (63,500) | (59,125) | (59,125) | (63,500) | (63,500) | (358,101) |
| Marketing | — | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (23,557) | (756,750) |
| Equipment Leases | (23,557) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (1,700) | (17,533) | (1,700) | (1,700) | (1,700) | (1,700) | (306,236) |
| Property and Business Insurance | (1,700) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (3,832) | (85,433) |
| Rent | (125,486) | (10,000) | (10,000) | (49,200) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (10,000) | (125,486) | (10,000) | (10,000) | (376,457) |
| Utilities | (3,832) | — | — | — | — | — | — | — | — | — | — | — | — | (49,820) |
| Travel and Other Expenses | (10,000) | — | — | — | — | — | — | — | — | — | — | — | — | (130,000) |
| Total Disbursements | (357,882) | (299,013) | (205,058) | (341,382) | (202,532) | (430,587) | (216,442) | (300,283) | (184,969) | (205,833) | (465,584) | (185,235) | (389,755) | (3,784,556) |
| Operating Cash Flow | (277,386) | (118,890) | 15,568 | (94,258) | 51,429 | (118,990) | 129,305 | 64,875 | 184,492 | 213,199 | (31,688) | 263,484 | 63,407 | 344,547 |
| **Non-Operating Cash Flows:** | | | | | | | | | | | | | | |
| Professional Fees | (112,500) | (82,500) | (67,500) | (92,500) | (78,745) | (72,500) | (62,500) | (87,500) | (77,359) | (72,500) | (67,500) | (87,500) | (76,967) | (1,038,071) |
| Past Due Employee Pay Matters | — | (85,218) | — | — | (111,621) | — | — | — | — | (289,417) | — | — | — | (486,256) |
| Insurance Reinstatements (Med, other) | (26,425) | — | — | — | — | — | — | — | — | — | — | — | — | (26,425) |
| Rent Eviction Cures | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Utility Deposits | — | (4,500) | (4,500) | (4,500) | (4,500) | — | — | — | — | — | — | — | — | (18,000) |
| Equipment Marshalling (Closed Locations) | — | — | (15,000) | — | — | — | — | — | — | — | — | — | — | (15,000) |
| Total Non-Operating Cash Flows | (138,925) | (172,218) | (87,000) | (97,000) | (194,866) | (72,500) | (62,500) | (87,500) | (77,359) | (361,917) | (67,500) | (87,500) | (76,967) | (1,583,751) |
| Net Cash Flow | $ (416,311) | $ (291,108) | $ (71,432) | $ (191,258) | $ (143,437) | $ (191,490) | $ 66,805 | $ (22,625) | $ 107,133 | $ (148,718) | $ (99,188) | $ 175,984 | $ (13,559) | $ (1,239,204) |
| **Cash Balance (Book)** | | | | | | | | | | | | | | |
| Beginning Balance | $ — | $ 33,689 | $ 42,581 | $ 21,149 | $ 29,891 | $ 36,454 | $ 44,964 | $ 111,769 | $ 89,144 | $ 196,277 | $ 47,559 | $ 23,371 | $ 199,355 | $ — |
| Net Cash Flow | (416,311) | (291,108) | (71,432) | (191,258) | (143,437) | (191,490) | 66,805 | (22,625) | 107,133 | (148,718) | (99,188) | 175,984 | (13,559) | (1,239,204) |
| Additions from DIP Funding | 450,000 | 300,000 | 50,000 | 200,000 | 150,000 | 200,000 | — | — | — | — | 75,000 | — | — | 1,425,000 |
| Paydown of DIP | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Ending Balance | $ 33,689 | $ 42,581 | $ 21,149 | $ 29,891 | $ 36,454 | $ 44,964 | $ 111,769 | $ 89,144 | $ 196,277 | $ 47,559 | $ 23,371 | $ 199,355 | $ 185,796 | $ 185,796 |
| **DIP Account Balance** | | | | | | | | | | | | | | |
| Beginning Balance | $ 170,000 | $ 620,000 | $ 920,000 | $ 970,000 | $ 1,170,000 | $ 1,320,000 | $ 1,520,000 | $ 1,520,000 | $ 1,520,000 | $ 1,520,000 | $ 1,520,000 | $ 1,595,000 | $ 1,595,000 | $ 170,000 |
| Borrowings | 450,000 | 300,000 | 50,000 | 200,000 | 150,000 | 200,000 | — | — | — | — | 75,000 | — | — | 1,425,000 |
| Paydowns | — | — | — | — | — | — | — | — | — | — | — | — | — | — |
| Ending Balance | $ 620,000 | $ 920,000 | $ 970,000 | $ 1,170,000 | $ 1,320,000 | $ 1,520,000 | $ 1,520,000 | $ 1,520,000 | $ 1,520,000 | $ 1,520,000 | $ 1,595,000 | $ 1,595,000 | $ 1,595,000 | $ 1,595,000 |

**Light Rx**
**Professional Fees Schedule**
**13-Week DIP Cash Flow Projection**

| Professional Firm | | Forecast Week 1 3/3/2019 | Forecast Week 2 3/10/2019 | Forecast Week 3 3/17/2019 | Forecast Week 4 3/24/2019 | Forecast Week 5 3/31/2019 | Forecast Week 6 4/7/2019 | Forecast Week 7 4/14/2019 | Forecast Week 8 4/21/2019 | Forecast Week 9 4/28/2019 | Forecast Week 10 5/5/2019 | Forecast Week 11 5/12/2019 | Forecast Week 12 5/19/2019 | Forecast Week 13 5/26/2019 | 13-Week FCST Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Wolfson Bolton | Debtor's Counsel | 50,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 350,000 |
| Conway MacKenzie | Debtor's FA | 55,000 | 45,000 | 35,000 | 35,000 | 35,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 35,000 | 30,000 | 30,000 | 450,000 |
| Dixon MacDonald | Debtor's Business Counsel | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| Deutzel Long | DIP Counsel | - | - | - | 25,000 | - | - | - | 25,000 | - | - | - | 25,000 | - | 75,000 |
| TBD | UCC Counsel | - | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 60,000 |
| US Trustee | (1% of disb.) | - | - | - | - | 11,245 | - | - | - | 14,859 | - | - | - | 14,467 | 40,571 |
| TBD | Claims Agent | 5,000 | 5,000 | - | - | - | 10,000 | - | - | - | 10,000 | - | - | - | 30,000 |
| **Total Professional Fees** | | 112,500 | 82,500 | 67,500 | 92,500 | 78,745 | 72,500 | 62,500 | 87,500 | 77,359 | 72,500 | 67,500 | 87,500 | 76,967 | 1,038,071 |
| **Memo: US Trustee Fee Accrual** | | | | | | | | | | | | | | | |
| Beginning Balance | | - | 4,704 | 8,519 | 11,245 | 15,583 | 7,039 | 12,070 | 14,859 | 18,737 | 6,353 | 9,136 | 14,467 | 17,194 | - |
| Incurred (pct. of disb) | 1.0% | 4,704 | 3,815 | 2,726 | 4,339 | 2,700 | 5,031 | 2,789 | 3,878 | 2,475 | 2,783 | 5,331 | 2,727 | 625 | 43,923 |
| Paid | | - | - | - | - | (11,245) | - | - | - | (14,859) | - | - | - | (14,467) | (40,571) |
| Ending Balance | | 4,704 | 8,519 | 11,245 | 15,583 | 7,039 | 12,070 | 14,859 | 18,737 | 6,353 | 9,136 | 14,467 | 17,194 | 3,352 | 3,352 |