# UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| Body Contour Ventures, LLC, | Case No. 19-42510-pjs |
| Debtor. | Hon. Phillip J. Shefferly |

## DECLARATION OF RICHARD C. MORGAN
## IN SUPPORT OF CHAPTER 11 FILINGS

I, Richard C. Morgan, declare as follows:

1. As further described in this declaration, I am the Manager and/or President of the debtors and debtors-in-possession listed below (collectively, "Debtors").[1]

---

[1] Debtors include Body Contour Ventures, LLC, Case No. 19-42510, BCA Acquisitions, LLC, Case No. 19-42511, American Aesthetic Equipment, LLC, Case No. 19-42512, Knoxville Laser Spa LLC, Case No. 19-42513, LRX Alexandria, LLC, Case No. 19-42514, LRX Birmingham, LLC, Case No. 19-42515, LRX Charlotte, LLC, Case No. 19-42516, LRX Chicago, LLC, Case No. 19-42517, LRX Colorado Springs, LLC, Case No. 19-42518, LRX Dearborn, LLC, Case No. 19-42519, LRX East Lansing, LLC, Case No. 19-42520, LRX Grand Blanc, LLC, Case No. 19-30413, LRX Hoffman Estates, LLC, Case No. 19-42521, LRX Las Vegas Summerlin, LLC, Case No. 19-42522, LRX Mesa, LLC, Case No. 19-42523, LRX Naperville, LLC, Case No. 19-42524, LRX Novi, LLC, Case No. 19-42525, LRX Orland Park, LLC, Case No. 19-42526, LRX Plymouth-Canton, LLC, Case No. 19-42527, LRX Stone Oak, LLC, Case No. 19-42528, LRX Towson, LLC, Case No. 19-42530, LRX Troy, LLC, Case No. 19-42531, Premier Laser Spa of Greenville LLC, Case No. 19-42532, Premier Laser Spa of Indianapolis LLC, Case No. 19-42533, Premier Laser Spa of

2. I am familiar with the day-to-day operations, business affairs, and books and records of Debtors.

3. Debtors filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Eastern District of Michigan on February 22, 2019 ("Petition Date").

4. Debtors are continuing in possession of their property and are operating and managing their businesses as debtors-in-possession under 11 U.S.C. §§ 1107(a) and 1108.

5. Debtors are seeking to have their Chapter 11 cases jointly administered. I refer to the bankruptcy cases arising from Debtors' petitions as the "Chapter 11 Cases."

6. To enable Debtors to minimize the adverse effects of the Chapter 11 Cases, Debtors are filing several "first day" applications and motions (collectively, the "First Day Pleadings"). The First Day Pleadings seek relief aimed at retaining employees, promoting efficient and effective bankruptcies, maintaining Debtors' going-concern value, and maximizing the value of Debtors' assets by completing a sale process Debtors started months before the Petition Date. I believe the relief sought in the First Day

---

Louisville LLC, Case No. 19-42534, Premier Laser Spa of Pittsburgh LLC, Case No. 19-42535, Premier Laser Spa of St. Louis LLC, Case No. 19-42536, and Premier Laser Spa of Virginia LLC, Case No. 19-42537.

Pleadings is crucial to achieving these goals.

7.     I submit this Declaration in support of the First Day Pleadings. This Declaration describes Debtors' operations and the circumstances surrounding the commencement of Debtors' Chapter 11 Cases.  Any capitalized terms not expressly defined in my Declaration have the meanings given to them in the relevant First Day Pleadings.  All facts in this Declaration are based on my personal knowledge, upon my review of relevant documents, or upon my opinion based upon my experience and knowledge of Debtors' operations, financial condition, and present liquidity crisis.  Nothing in this Declaration is intended to be or should be construed as an admission of the validity of debts, obligations, defaults, claims, security interests, liens, or any other rights or interests that may be asserted against Debtors.  If called to testify, I could testify competently to these facts.

8.     Part I of this Declaration describes Debtors' businesses and the circumstances surrounding the commencement of the Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## I. Background

## Debtors' Ownership

9.     I formed Debtors Body Contour Ventures, LLC ("BCV"), BCA Acquisitions, LLC ("BCA"), and American Aesthetic Equipment, LLC ("AAE") in 2014.

10.     Debtors' stores provide non-surgical cosmetic and aesthetic procedures such as body contouring, skin tightening, and laser hair removal.

11.     BCV is owned (a) 35.25% by the Richard C. Morgan Living Trust U/A/D February 8, 2006, as amended and restated ("Morgan Trust"), for which I am the Trustee, (b) 10% by VPS Investments, LLC, (c) 30% by Jeff S. Pierce, D.O., (d) 9% by Chaoju International, LLC, (e) 8.75% by Fedor Fedorov, and (f) 7% by ZLM Investments, LLC.

12.     BCA is owned (a) 67.5% by non-debtor BCA Holdings, LLC, (b) 30% by Silco Funding, LLC, and (c) 2.5% by Lite RX Holdings, LLC.

13.     Non-debtor BCA Holdings, LLC is owned (a) 46% by the Morgan Trust, (b) 30% by Jeff S. Pierce, D.O., (c) 9% by Chajou International, LLC, (d) 8% by Fedor Fedorov, and (e) 7% by ZLM Investments, LLC.

14.     AAE is owned (a) 55.2% by the Morgan Trust, (b) 36.8% by Jeff

S. Pierce, D.O., and (c) 8% by Fedor Fedorov.

15.    Debtors provide their services through 25 stores across the nation.  BCV holds an interest in 18 of the stores (collectively, "BCV Stores"), while BCA holds an interest in seven of the stores (collectively, "BCA Stores").  The BCV Stores and BCA Stores are referred to collectively as the "Stores," and individually as a "Store."

16.    Various third-party investors hold interests in some or all of the BCV Stores and BCA Stores.  An overview of Store ownership is detailed in the list of equity security holders filed with each Debtor's petition.  An organization chart is attached to this Declaration.

## Debtors' Business Model

17.    The Stores are located and operate throughout the United States, most often in strip malls.  Each Store offers SculpSure, Venus, and/or Merz brand equipment that is used to perform cosmetic procedures. The SculpSure and Venus equipment is owned by AAE, while the Merz equipment is owned by BCV.

18.    BCV provides management services to each of the Stores. Each Store pays a monthly management fee to BCV, and these management fees are BCV's sole source of income.

19.    Each Store operates with an average staff of three to five

employees, led by a Store director.  All of the employees providing services at the Stores are employed by BCV, not by the individual Stores.

20.    BCV handles all of the marketing and lead generation for each Store.  Leads are generated by a variety of marketing initiatives, including search engine marketing, direct mail, and radio targeted at specific geographical areas near the Stores.

21.    Marketing is intended to drive prospective customers to a website where "call to action" ads give rise to leads.  Leads take the form of customers filling out a form requesting a free consultation or the prospect calling a toll-free number to speak to a customer service representative ("CSR").  The CSR explains the Stores' services and seeks to schedule a consultation for the customer at a nearby Store.

22.    BCV operates an in-house call center at its corporate office in Farmington Hills, Michigan.  The call center has historically employed 12-15 people covering several shifts.

23.    Store staff conducts the consultations and are directly responsible for selling services and products.  The majority of sales relate to services performed at the Stores through the use of SculpSure, Venus, and Merz equipment, although most Stores also carry some products like creams and topicals for resale.  The sale of products has generally

accounted for less than 5% of a Store's overall sales.

24.     Each Store is party to a commercial lease for use of the real property from which it operates (individually a "Lease" and collectively, the "Leases").  Each Store's obligations under its respective Lease is guaranteed by either BCA or BCV (the "Guarantor Obligations").

25.     BCV, BCA, AAE, and the Stores operate under an integrated cash management system.  Each Store processes and collects receivables generated by the services it provides, which receivables are primarily collected from credit card processing and customer financing companies. Each Store's collected receipts are deposited into its own bank account. Typically, on a daily basis, BCV sweeps the bank accounts of the BCV Stores, and BCA sweeps the bank accounts of the BCA Stores.  The funds collected by BCA are then swept up to BCV, usually on daily basis.  As a result of this system, all of the income generated by the Stores (with the exception of some minimal funds that are at times retained by BCA) is transferred directly or indirectly to BCV.

26.     BCV then uses the funds it receives from each Store to (i) pay itself a management fee relating to the Store, and (ii) to pay each Store's direct expenses, including the Store's monthly rental obligation to its landlord, payroll for the Store's employees, and direct marketing expenses.

27.     BCV funds its own operations solely with the management fees that it receives from the Stores.  BCV receives no income other than the management fees.  If the Stores stop operating, BCV will no longer generate income and will be forced to immediately cease operations.  As a result, BCV, BCA, AAE, and the Stores comprise an integrated business enterprise where the operations of Debtors are critically dependent on the operation of the Stores, and vice versa.

### Debtors' Capital Structure

28.     Debtors' overall business was capitalized by individual investors or investor groups on a Store-by-Store basis ("Store Level Investors").  Typically, Store Level Investors capitalized a specific store by loaning start-up capital to the store under a promissory note with a five-year term, bearing interest at between 8% and 12% annually (collectively the "Investor Loans" or individually an "Investor Loan").  A majority of the Investor Loans are guaranteed by BCV.

### Events Leading Up To The Chapter 11 Cases

29.     In light of the confluence of factors described below, Debtors determined that it is in their best interest to commence these Chapter 11 Cases.

30.     Debtors' original growth plan called for the opening of 15 stores

per year financed with outside individual investor capital.  Thereafter, Debtors contemplated that additional growth would be funded by internal profits, which would eliminate the need for further outside capital.

31.     Historically, new stores would begin contributing positively toward corporate overhead (i.e., individual store profitability would be achieved) within six months of opening and breakeven operations normally occurred in about four months.

32.     Debtors intended to use investor capital to fund capital expenditures and start-up losses for each store during this initial period of no or low profitability.

33.     However, due to strong investor demand, the decision was made in the fourth quarter of 2017 to accelerate the growth trajectory.  This accelerated growth continued into the first quarter of 2018.  Between the end of 2017 and beginning of 2018, 15 to 20 new stores opened in new markets.

34.     In a departure from prior practice, BCV and BCA began opening several stores in a single market, in an effort to spread the marketing cost in each of these new markets across several stores.

35.     At its peak, BCV and BCA owned and controlled 88 separate operating stores.

36. Unfortunately, in retrospect, this strategy was misplaced because the new markets became over-saturated with stores, thereby impairing all of the stores' financial performance in each of the new markets.

37. The result was that the new stores failed to break-even and the operating losses at these locations began to impair liquidity of BCV and BCA starting in the first quarter of 2018. The negative cash flow at these stores was compounded by payments required to be made to these stores' investors pursuant to the Investor Loans.

38. The tightening of liquidity in early 2018 led BCV to reduce marketing costs throughout the organization, which negatively impacted sales at numerous stores. The reduction in sales resulting from the inability to afford adequate marketing further aggravated BCV's and BCA's liquidity challenges.

39. It became clear to BCV and BCA management that a significant injection of capital would be required to address the operating losses resulting from the over-expansion, as well as to properly capitalize BCV and BCA for continued growth.

40. In the first quarter of 2018, I identified an investor willing to inject $15 million of new equity into BCV and BCA between June 2018 and

February 2019.  In reliance on this expected investment, BCV continued executing its growth plan, consistent with the plan that had been presented to the investor.

41.    As liquidity continued to constrict during the second quarter of 2018, BCV began to take actions to conserve cash, including interrupting payments to investors, curtailing marketing spend, and deferring equipment payments.

42.    As a result of increasing investor pressure and unrest, and in anticipation of the injection of new capital commencing in June 2018, BCV resumed payments to investors, further straining liquidity.

43.    The new investor funding was not finalized in June 2018 and discussions continued to drag into the summer.  I remained confident at that time that the investment would still occur and that it was only a timing issue.

44.    As I waited for the new money, more extreme self-help measures became unavoidable, including beginning to defer landlord rent payments at the stores.

45.    At the end of August 2018, the investor again asked for more time.  However, at this point, the ability to manage the liquidity crisis had become unsustainable and BCV and BCA were left with no choice but to

begin closing under-performing stores to mitigate the cash burn. These actions changed the business dynamics and undermined the investment thesis of the prospective investor.

46.    Since late August, Debtors have undertaken the following actions to conserve cash while considering a variety of alternatives (some of these are a continuation of cash conservation actions commenced before the end of August):

    a.    Closed 62 operating stores;
    b.    Ceased payments to investors;
    c.    Continued the deferral of landlord rent payments and equipment payments;
    d.    Stretched trade vendors;
    e.    Restructured the sales bonus plan to reduce the aggregate level of earned bonuses;
    f.    Instituted enhanced controls over staff scheduling to improve efficiency and reduce staff hours; and
    g.    Reduced the headcount at corporate services.

47.    As a result of the payment delinquencies to landlords and other creditors, BCV, BCA, and nearly all of the Stores are facing lawsuits, threats of collection litigation and eviction proceedings.

48.    Current and past due liabilities for all of the entities include marketing-related obligations, past due investor payments, past due landlord rent payments, and past due equipment payments.

49.    Debtors have little, if any, credit available from trade and other vendors and are operating on a COD or CIA basis with most vendors.

## II. Motions

### First Day Motion of the Debtors for the Entry of an Order Directing Joint Administration of Debtors' Chapter 11 Cases

50.     The motion for joint administration seeks the entry of an order, directing (a) the joint administration of Debtors' Chapter 11 cases under Fed. R. Bankr. P. 1015(b) and E.D. Mich. LBR 1015-1 for procedural purposes only, and (b) parties in interest to use the caption contained in the proposed order

51.     Debtors are affiliates of one another and are privately held entities wholly-owned by the equity security holders identified in the lists filed with the Court under Fed. R. Bankr. P. 1007(a)(3).  The Richard C. Morgan Living Trust U/A/D February 8, 2006, as amended and restated, holds a direct interest in Debtors BCV and AAE, and an indirect interest in Debtor BCA.  BCV holds an interest in 18 of the operating Debtors, while BCA holds an interest in 7 of the operating Debtors.

52.     Debtors' overall business was capitalized by various individual investors or investor groups on a Debtor-by-Debtor basis.  Most often these investors capitalized a specific operating Debtor by loaning start-up capital to the Debtor.  The vast majority of these loans are guaranteed by BCV.

53.     None of the Debtors are a guarantor or co-obligor of any obligations of any non-Debtor equity holders.

54.    None of the Debtors are publicly traded entities.

55.    In the ordinary course of business and before the Petition Date, funds have been transferred between Debtors.  A complete list of transfers will be disclosed and incorporated in Debtors' statements of financial affairs to be filed with the Court.

56.    Joint administration of these Chapter 11 cases will (a) ease the administrative burden on the Court and the parties, (b) protect creditors of different estates, and (c) simplify the United States Trustee's supervision of the administrative aspects of Debtors' Chapter 11 cases.

57.    Debtors consist of 28 affiliated entities.  Debtors anticipate that numerous notices, applications, motions, other pleadings, hearings, and orders in these cases will affect all Debtors.  With so many affiliated Debtors, each with its own case docket, the failure to administer these cases jointly would result in filing numerous duplicative pleadings and serving such pleadings upon separate service lists.  Such duplication of substantially identical documents would be extremely wasteful and would unnecessarily overburden the Court.

58.    Joint administration will permit the Court to use a single general docket for each of Debtors' cases and combine notices to creditors and other parties in interest of each of Debtors' respective estates.  Joint

administration will also protect parties in interest by ensuring that such parties in each of the Debtors' respective Chapter 11 cases will be apprised of the various matters before the Court in all of these cases.

59.    The rights of Debtors' respective creditors will not be adversely affected by joint administration as the relief sought is purely procedural and does not affect substantive rights.  Each creditor and party in interest will maintain whatever rights it has against the particular estate in which it allegedly has a claim or right.  Indeed, the rights of all creditors will be enhanced by the reduction in costs resulting from joint administration.  The Court will also be relieved of the burden of entering duplicative orders and keeping duplicative files.  Supervision of the administrative aspects of these Chapter 11 cases by the Office of the United States Trustee also will be simplified.

**Emergency Motion for Interim and Final Orders Authorizing Debtors to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis and Scheduling a Final Hearing**

60.    Debtors need the financing requested in this Emergency Motion to stave off an imminent liquidation and the loss of jobs around the country. The proposed lender is the only potential source of financing Debtors have located after an extensive search and several false starts.  The proposed lender is not an entrenched bank seeking to shore up its position or even a

financing institution.  It is a limited liability company, some of whose members are minority equity investors in some of the Debtors who have banded together in an attempt to save these companies when no one else would.  The financing is expected to provide the Debtors a bridge to a sale to the DIP Lender or a third party that submits the highest and best bid. Simply put, without immediate approval of this financing, Debtors are done.

61.     While Debtors have spoken to other potential lenders for debtor-in-possession financing, the only party that is willing to make debtor-in-possession financing available on terms that Debtors reasonably believe can be satisfied is the DIP Lender.

62.     Debtors courted their last expected combined source of debtor-in-possession financing and stalking horse, an unrelated/non-insider third party, for several months, only to have the expected financing source opt not to lend at beyond the eleventh hour in late January, 2019.

63.     Generally, the DIP Lender proposes financing Debtors' projected cash needs of up to a maximum amount of $1,700,000 per the Budget through an anticipated § 363 sale closing date to occur no later than May 24, 2019.  This financing would occur under §§ 364(c)(1), 364(c)(2), and 364(c)(3) of the Bankruptcy Code.  The DIP Facility does not contemplate cross-collateralization.  The DIP Facility is also proposed to be

used as the deposit for the DIP Lender as the Stalking Horse Bidder in an Asset Purchase Agreement.

64.    It would be time consuming, expensive, and ultimately futile for Debtors to further attempt to obtain approval for financing with a lender other than the DIP Lender.  Debtors are unable to obtain the required funds in the form of unsecured credit or unsecured debt allowable under § 503(b)(1) of the Bankruptcy Code, as an administrative expense under §§ 364(a) or 364(b) of the Bankruptcy Code, or on terms otherwise more favorable than those terms offered by the DIP Lender.

**First Day Motion for Entry of an Order Authorizing the Continued Use of Debtors' Pre-Petition Cash Management System, Bank Accounts, and Business Forms**

65.    To avoid disruption to the normal operations of Debtors' businesses, the cash management motion seeks the entry of an order permitting Debtors to continue to use their pre-petition Cash Management System, Bank Accounts, and business forms associated with the Bank Accounts, all as defined below.

66.    Debtors maintain a cash management and disbursement system in the ordinary course of their businesses (collectively, "Cash Management System").  Through the Cash Management System, Debtors are able to monitor their cash position on a daily basis.

67.     Disbursements under the Cash Management System are controlled primarily by Debtors' financial personnel through Debtors' bank accounts ("Bank Accounts"), which accounts are set forth on Exhibit 2 attached to the motion.

68.     Through the Cash Management System, Debtors are able to monitor the collection and disbursement of funds and maintain control over the administration of the Bank Accounts required to effect the collection, disbursement, and movement of cash related to the Debtors' operations.  In addition, the Cash Management System facilitates Debtors' ability to produce accurate financial reporting.

69.     The Cash Management System consists of numerous operating accounts at Bank of America into which funds are deposited from Debtors' business operations.  Each day, the funds in the accounts are swept by Debtor Body Contour Ventures, LLC, which then uses the funds in the ordinary course of business to pay itself a management fee and the expenses for each Debtor.

70.     Debtors utilize these accounts to make all disbursements.

71.     Maintaining the Cash Management System and Bank Accounts will best serve Debtors' estates, vendors, and employees.

72.     The benefit to Debtors' estates will be considerable because it

will assist in accomplishing the transition to operating under Chapter 11 without the costs and disruptions associated with closing and opening Debtors' Bank Accounts.

### A. Cash Management System

73.     Debtors request authority to continue to manage their cash consistent with historical pre-petition practice, except as modified by the motion.

74.     The cost and expense of creating a new Cash Management System or changing Debtors' Bank Accounts would not only force Debtors to incur significant and unnecessary costs and expenses, but would impair the ordinary operation of Debtors' businesses.

75.     Forcing Debtors to employ a new Cash Management System and open new Bank Accounts would cause confusion, disrupt payroll, introduce inefficiency at a time when efficiency is most critical, and strain Debtors' relationships with customers and vendors.  These relationships must be maintained for Debtors to have the opportunity to successfully reorganize.  Remitting payments to new and different accounts will result in a significant slowdown in Debtors' collections at a time when prompt collection is critical.

76.     Debtors' Cash Management System is similar to those utilized

by other corporate enterprises.

77. The Cash Management System permits Debtors to provide availability of funds when and where necessary and develop timely and accurate accounting information.

78. Debtors intend to continue to maintain strict accounting records, including receipts and disbursements, so that the United States Trustee and parties in interest may readily monitor Debtors' financial activities.

### B. Bank Accounts

79. Integrally related to Debtors' Cash Management System is the continued existence of the Bank Accounts.

80. Debtors and their customers, employees, and vendors would suffer severe hardship if Debtors were required to substitute a new debtor-in-possession bank account for the existing Bank Accounts.

81. Substitution of the Bank Accounts would essentially render this Court's approval of the continuation of the Cash Management System, if granted, meaningless, and inevitably lead to the same delays, confusion, and disruption of Debtors' businesses, including significant slowdown in the collection of payments from customers.

82. All parties in interest will be best served, and Debtors will benefit considerably, by preserving business continuity and avoiding the

operational and administrative paralysis that closing the Bank Accounts and opening new bank accounts would necessarily entail.

83.     Debtors do not seek authority to pay any pre-petition claims that have not yet been honored by the applicable drawee bank.  To the contrary, with the exception of payments Debtors are seeking to pay that are otherwise authorized by the Court ("Allowed Payments"), which payments may include pre-petition bank fees, Debtors seek to prohibit and enjoin their bank from honoring pre-petition checks.

84.     Debtors intend to work with their bank to identify, by check number or other appropriate means, the specific checks, drafts, wires, or ACH transfers that are designated as Allowed Payments.

85.     Debtors request that the Court direct Debtors' bank to continue to receive, process, honor, and pay any and all checks, drafts, wires, or ACH transfers drawn on the Bank Accounts after the Petition Date for the Allowed Payments (to the extent sufficient funds are on deposit to honor the checks) without regard to when the checks were issued.

86.     This relief is necessary to implement, to the extent granted, and is subject to, the relief requested by Debtors in their motions seeking authority to pay pre-petition wages owing to Debtors' employees.

87.     Debtors request that the Bank Accounts held by Debtors be

deemed to be "debtor-in-possession" accounts. Debtors intend to provide notice of entry of the any order granting the motion to their bank within 3 business days of the order's entry.

## C. Business Forms

88. Debtors also request permission to use their existing business forms and stationery (collectively, "Business Forms") without alteration.

89. Parties doing business with Debtors undoubtedly will be aware of Debtors' status as Chapter 11 debtors-in-possession. Debtors do not print their business forms and stationery. Thus, substantial time and expense would be required if Debtors were required to print new business forms and stationery merely to indicate "debtor-in-possession." Changing business forms at this critical, early stage of these Chapter 11 cases would be expensive and burdensome to the Debtors' estates and present an unnecessary distraction.

## D. Wire and Automatic Clearing House Payments

90. Debtors seek relief from the Operating Instructions and Reporting Requirements for Chapter 11 Cases to the extent that they require Debtors to make all disbursements by check.

91. Considering the nature of Debtors' operations, it is often necessary for Debtors to conduct transactions by debit, wire, ACH

payment, or other similar methods.  In addition, a number of Debtors'
receipts are received by wire transfer.

92.    To deny Debtors the opportunity to conduct business by debit,
wire, ACH payment, or other similar methods would interfere with and
unnecessarily disrupt Debtors' business operations, as well as create
additional costs to Debtors.

**First Day Motion for Entry of Order (A) Approving Proposed Adequate
Assurance Procedures, (B) Approving Payment of Adequate
Assurances, and (C) Prohibiting Utilities from Altering, Refusing, or
Discontinuing Services**

93.    The utilities motion seeks to establish procedures to provide for
an orderly determination of any adequate protection disputes without the
risk of unilateral termination of any Utility Services.  Specifically, the motion
seeks the entry of an order: (i) approving certain procedures ("Adequate
Assurance Procedures") for determining adequate assurance of payment to
Utilities; (ii) approving the proposed payments to the Utilities as provided in
the Adequate Assurance Procedures; and (iii) prohibiting any Utility from
unilaterally altering, refusing, or discontinuing services except according to
the Adequate Assurance Procedures or as permitted by Court order.

94.    Debtors' utility providers (each a "Utility" and, collectively,
"Utilities") are responsible for providing Debtors with electricity, gas, water,
telephone, and other communications services ("Utility Services").  A list of

Debtors' Utilities is attached to the motion as <u>Exhibit 2</u>, along with the average monthly payments to each Utility based on location ("<u>Average Monthly Payments</u>").  Debtors' average total monthly payments for Utilities is approximately $11,400.

95.     Continued Utility Services are critical to Debtors' businesses. Any discontinuation or interruption of the Utility Services, even for a brief period, would severely disrupt Debtors' operations and impair Debtors' abilities to reorganize.  Debtors are therefore prepared to provide adequate assurance to the Utilities to promote confidence in Debtors' ability and intent to pay for their post-petition Utility Services.

96.     Although Debtors believe that no additional assurances of post-petition payment are required to provide the Utilities with adequate assurance, Debtors propose to provide a deposit equal to one quarter of the Average Monthly Payments for each Utility at each location listed on <u>Exhibit 2</u> to the motion ("<u>Adequate Assurance Deposits</u>") to each Utility that requests an Adequate Assurance Deposit under the Adequate Assurance Procedures.

97.     While Debtors believe that the Adequate Assurance Deposits will provide each Utility with adequate assurance, Debtors request that the Court implement the following Adequate Assurance Procedures to protect

Debtors from interruptions in Utility Services and to preserve the Utilities' rights to request additional assurances:

98. Debtors' proposed Adequate Assurance Deposits are sufficient to provide adequate assurance of future performance to each of the Utilities, and the proposed Adequate Assurance Procedures will provide a full, fair, and timely opportunity for a Utility to object.

99. Moreover, Debtors must be provided with certainty that the proposed adequate assurance of payment is "satisfactory" to the Utilities. Debtors seek to avoid the concern that, thirty days after the Petition Date, Debtors will be informed that the proposed adequate assurance is not satisfactory, coupled with an imminent threat to discontinue utility service.

100. The requested relief will not prejudice the Utilities' rights and does not adjudicate the merits of any objection, but only provides a procedural framework for resolution of any disputes without the risk of a unilateral termination of Debtors' Utility Services.

**First Day Motion for an Order Authorizing Debtors to Pay Pre-Petition Wages, Compensation, and Employee Benefits**

101. To continue Debtors' business operations for the benefit of all creditors and to minimize the personal hardship to Debtors' employees during this critical time, the motion to pay pre-petition wages, compensation, and employee benefits seeks entry of an order authorizing

but not directing Debtors to:

a.    pay and honor all pre-petition Employee Obligations and Employee Benefits, including the Unpaid Wages and Salaries, Unpaid Remittances, Unpaid 401k Contributions, and Unpaid Expense Reimbursements (collectively, the "Unpaid Amounts");

b.    continue to maintain and provide all Employee Benefits provided by Debtors in the ordinary course of Debtors' business;

c.    pay all Unpaid Amounts required to be paid under, or incident to, the Employee Benefits to the extent any amounts accrued pre-petition and/or accrued post-petition but relate to the period before the Petition Date; and

d.    modify, cancel, discontinue, and/or replace, without the need for further notice or Court approval, any policies, plans, offerings, or programs relating to any Employee Obligations or Employee Benefits as Debtors deem appropriate, and to pay any amounts necessary to effect a modification, cancellation, discontinuance, or replacement in the ordinary course of business without the need for further Court approval.

102.    The Employees' knowledge and understanding of Debtors' operations and customer relations are essential to the effective restructuring of Debtors' businesses.

103.    Absent the continued services of the Employees, an effective restructuring of Debtors would not be possible.

104.    If pre-petition wage, compensation, benefit, and reimbursement

amounts are not received by Employees in the ordinary course, they will suffer extreme personal hardship and, in many cases, will be unable to pay their basic living expenses.

105.   Moreover, Debtors' failure to timely pay wages and compensation would destroy Employee morale and likely result in work stoppages and sudden and unmanageable Employee turnover, causing immediate, pervasive, and irreparable damage to Debtors' on-going business operations and Debtors' ability to reorganize.

106.   Even a temporary work stoppage could cause Debtors irreparable harm given Debtors' business model, which relies upon on-line marketing initiatives to generate in-store consultations, which in turn result in the direct selling of products and services by Debtors' Employees to customers.

107.   The vast majority of Employees rely exclusively on their compensation to continue to pay their daily living expenses.

108.   These individuals will be exposed to significant financial difficulties if Debtors are not permitted to pay the Unpaid Amounts.

109.   Debtors anticipate that any failure to timely pay pre-petition wages and compensation would result in a work stoppage.

110.   If Debtors are unable to honor commitments to fund the Unpaid

Amounts, Debtors anticipate a loss of Employee morale and significant Employee turnover resulting in business interruptions, decreased quality control, and increased expenses.

111.   Accordingly, payment of all Unpaid Amounts is necessary to preserve Debtors' value as a going concern and to avoid immediate and irreparable harm.

### First Day Motion for Entry of an Order (A) Authorizing A Consolidated Creditor Matrix; (B) Authorizing the Filing of a Consolidated List of Top 30 Unsecured Creditors; and (C) Authorizing the Mailing of Initial Notices

112.   The consolidated creditors list motion seeks an order: (A) authorizing and allowing the use of a consolidated creditor matrix, (B) authorizing Debtors to file a single consolidated list of Debtors' top 30 largest unsecured creditors in lieu of filing separate lists of the top 20 unsecured creditors for each Debtor, and (C) authorizing Debtors to mail initial notices.

### A.    List of Creditors

113.   Debtors comprise 28 separate entities with at least 650 total creditors.

114.   If each of the 28 Debtors was required to file its own individual matrix, such creditors would needlessly receive multiple duplicate notices from the Court because there is significant overlap between the creditors of

each of the Debtors in these Chapter 11 cases.

115.   Debtors are simultaneously requesting authority to retain BMC Group, Inc. as claims, noticing, and balloting agent in these Chapter 11 cases.

116.   Debtors intend to furnish their consolidated matrix to the claims agent so that the claims agent can undertake the mailing of various notices.

117.   Because the claims agent will utilize the consolidated mailing matrix, and will use that list to furnish those creditors and equity security holders with notices, the filing of separate mailing matrices specific to each Debtor serves no practical purpose.

118.   Accordingly, it is in the best interest of Debtors' estates and creditors to avoid the cost and risks associated with preparing and filing separate mailing matrices specific to each Debtor and to allow Debtors to utilize a consolidated mailing matrix.

**B.    Top 30 Creditors**

119.   Given the size and complexity of Debtors' businesses, Debtors believe that filing a consolidated list of their creditors holding the 30 largest unsecured claims would facilitate the United States Trustee's review of creditors' claims and its appointment of a creditors committee in these Chapter 11 cases.

120. By contrast, the filing of multiple top 20 lists of unsecured creditors for each of the 28 Debtors would impose an unnecessary burden on the United States Trustee without providing any benefit.

121. Considering the burden that would be imposed upon the United States Trustee by filing separate top 20 lists, and the absence of any corresponding benefit, Debtors request authority to file a consolidated list of Debtors' top 30 unsecured creditors in lieu of filing separate top 20 lists for each Debtor.

122. Debtors believe that such relief is appropriate under the circumstances for the efficient and orderly administration of these cases.

## C. Mailing Initial Notices to Creditors

123. The claims agent will additionally assist Debtors in preparing creditor lists and mailing initial notices to the consolidated list of creditors, such as (a) a notice of filing of these Chapter 11 cases, (b) a notice of a meeting of creditors, (c) a notice of the time fixed for filing objections to and the hearing to consider approval of a disclosure statement or to consider confirmation of a plan, and (d) any correspondence Debtors may wish to send to creditors with respect to these Chapter 11 cases.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Richard C. Morgan

Executed on February 25, 2019
in _FARMINGTON HILLS_, Michigan



**LRX**
- LRX Alexandria, LLC
- LRX Birmingham, LLC
- LRX Charlotte, LLC
- LRX Chicago, LLC
- LRX Colorado Springs, LLC
- LRX Dearborn, LLC
- LRX East Lansing, LLC
- LRX Grand Blanc, LLC
- LRX Hoffman Estates, LLC
- LRX Las Vegas Summerlin, LLC
- LRX Mesa, LLC
- LRX Napeville, LLC
- LRX Novi, LLC
- LRX Orland Park, LLC
- LRX Plymouth-Canton, LLC
- LRX Stone Oak, LLC
- LRX Towson, LLC
- LRX Troy, LLC

**Premier Laser and Knoxville**
- Knoxville Laser Spa LLC
- Premier Laser Spa of Greenville LLC
- Premier Laser Spa of Indianapolis LLC
- Premier Laser Spa of Louisville LLC
- Premier Laser Spa of Pittsburgh LLC
- Premier Laser Spa of St. Louis LLC
- Premier Laser Spa of Virginia LLC

Richard C. Morgan, Jr. Living Trust (Non-Debtor)

Body Contour Ventures, LLC (Debtor)

LRX (18 Debtors)

BCA Holdings, LLC (Non-Debtor)

BCA Acquisitions, LLC (Debtor)

Premier Laser and Knoxville (7 Debtors)

American Aesthetic Equipment, LLC (Debtor)

\*\*Debtors are not wholly-owned subsidiaries.
The organization chart excludes various investors.